# EXHIBIT "B"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| MARY BECKER, individually & as guardian of DAVID BECKER, | : | |
| Plaintiff, | : | Case No. 2:07-CV-311 PGC |
| vs. | : | |
| JASON BATEMAN, EDWARD RHOADES & HEBER CITY CORPORATION. | : | |
| | : | Report of Kenneth R. Wallentine |
| Defendants. | | |

---

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports: deposition transcripts of Officer Jason Bateman and Chief Edward Rhoades; transcript of the May 14, 2005 traffic stop of David Becker; Heber City Police reports 0412-0047 and 0505-0361; Jason Bateman Heber City Police training records; Heber City Police Department Report of Administrative Investigation; Heber City Police Department Use of Force Policy; Mike Clegg memo of May 16, 2005; DUI Citation number D480293; the reports of plaintiffs' experts; video recording of the May 14, 2005 traffic stop of David Becker; and policies and procedures of the Heber City Police Department.

Kenneth R. Wallentine states as follows:

1.     I am a law enforcement officer in the State of Utah. I serve as Chief of Law Enforcement for the Utah Attorney General. I was formerly employed as Investigations Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper conduct, excessive force, officer integrity, and criminal acts alleged to have been committed by certified and certifiable law enforcement officers. I also had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety. I was certified as a law enforcement officer in the State of Utah in 1982. My present duties include direct supervision and command of three Investigation Sections, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians directly in my employ, several additional part-time sworn officers, as well as several other law enforcement officers assigned to my agency in cooperative interagency agreements or task forces. I directly supervise the State of Utah Child Abduction Response Team and the Officer-Involved Fatality Investigation Team.

2.     I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, and a variety of In-service Curriculum subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, internal affairs investigations legal issues, officer misconduct and discipline, and use of force/firearms instructor liability. I regularly teach in the Basic Training and In-service programs

of the Utah State Police Academy, and occasionally teach in other law enforcement academies. I

regularly teach in the following specialized courses: Advanced Officer Course, Employee

Discipline and Administrative Procedures Course (formerly known as Internal Affairs), Firearms

Instructor Course, First Line Supervisor Course, POST K9 Unit Administrator Course, POST

Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a POST-

certified Law Enforcement Firearms Instructor. I have been the principal firearms instructor for

the Utah POST Law Enforcement Official and Judge Firearms Training Program for the past

several years. I created the curriculum and served as a principal instructor for the Utah POST

Command College. In cooperation with the Utah Sheriffs Association and the Utah Jail

Commanders Association, I teach investigation of officer-involved fatalities and in-custody

deaths, employee selection, employee discipline and internal affairs courses to county law

enforcement and corrections command staff. I frequently present risk management courses for

law enforcement executives and county and municipal legal counsel and specifically instruct on

the adequacy of police training.

3.      I am a licensed attorney, having practiced law on at least a part time basis since 1990. I

am admitted to practice before the United States Supreme Court, the Courts of Appeals for the

Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of

the Bench of the American Inns of Court, Inn One, where I also serve as immediate past-President

of the Inn of Court. I am an appointed Administrative Law Judge for the State of Utah and for

certain counties and cities in Utah.

4.      In addition to my primary employment, I occasionally consult and provide expert opinions

on police procedures, and use of force issues. I am on the adjunct faculty of Excelsior College,

teaching Criminal Procedure, Management Strategies for Public Safety and a variety of other undergraduate courses in the School of Liberal Arts, Criminal Justice Department, and teach the occasional course for the English Department. I provide law enforcement academy curriculum consulting and accreditation review services for the United States Department of Justice. I am a program and grant reviewer for the Office of Justice Programs, United States Department of Justice. I have also served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

5.      I am a consultant to the Utah Risk Management Mutual Association, one of the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, sufficiency of training, hiring and screening practices, use of force, and police agency policies. I am the co-founder of, and legal advisor to, a best practices advisory group charged with developing model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including full policy drafting responsibility for one of the state's larger law enforcement agencies.

6.      I participate and serve in a number of community and professional capacities. I am a member of the Scientific Working Group on Dog and Orthogonal Factors, a national best practices and standards organization working on behalf of the Federal Bureau of Investigation, the

United States Department of Homeland Security, and the United States Transportation Security Administration, with research and peer review coordinated by the International Forensic Research Institute at Florida International University. Other professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, and member of the United States Police Canine Association. I have served as co-Chairman or Chairman of the Utah Law Enforcement Legislative Committee for the past six years. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training, under Governor Michael Leavitt.

7.      Since 1994, I have been a member of the K9 Academy for Law Enforcement consulting group and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. In the past few years, I have restricted my travel outside the State of Utah, but have continued to provide use of force, civil rights liability, and search and seizure law enforcement training in Arizona, Iowa, and California. Over the past several years, I have lectured and trained police officers and administrators from Wyoming, Arizona, Connecticut, Florida, North Carolina, South Carolina, Texas, Utah, Colorado, Alabama, Louisiana, Nevada, New York, New Hampshire,

Vermont, Rhode Island, Maine, Delaware, Wisconsin, Michigan, Indiana, Washington, Oregon, Nebraska, Georgia, California, Nevada, and Idaho.

8.      I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders* was published in late 2007 by the American Bar Association Publishing Division.  It is a treatise on public safety and criminal procedure. I am presently under contract to Lexis/Nexis for publication of a forthcoming book that will address police use of force and other topics.  My other published works include: *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*, IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST, Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of the Future?*, Police, April 2000; *Legal Risks of Tactical Operation*, Police, April 1999; *Dogs of War (K9 Use of Force)/FLSA & K9 Handlers*, Police, December 1998/January 1999; *No-knock & Nighttime Searches*, Police, September 1998; *The Respectable Roadblock Ruse*, Police, June 1998; *If at First You Don't Succeed . . .*, Clark

Memorandum, Fall 1998; *Preparing and Executing Search Warrants* (UPOA 1998); *Taking a Real Bite Out of Crime: Successful Risk Management for K9 Programs*, Utah Peace Officer, Summer 1996; *Lobbying, PACs and Campaign Finance* (West Publishing 1994), co-author; *Heeding the Call: Search and Seizure Jurisprudence Under Article I, Section 14, of the Utah Constitution*, 17 Utah Journal of Contemporary Law 267 (1991); *RICO & the Prime: Taking a Bite out of Crime?*, 2 Utah Bar Journal 7 (1991); *Margaret Bush Wilson and Shelley v. Kraemer*, 4 B.Y.U. J. Pub. Law 207 (1990); *Wilderness Water Rights: The Status of Reserved Rights After the Tarr Opinion*, 4 B.Y.U. J. Pub. Law 357 (1989); *Negligent Hiring: The Dual Sting of Pre-Employment Investigation*, 8 Utah B.J. 15 (1989), and a variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).

9.     I infrequently serve as an expert witness and I charge a fee for private consultation services and court testimony. For those matters which progress beyond an initial brief consultation, I charge $150.00 per hour for all activities outside of court testimony, a travel fee of $500.00 per day, plus actual expenses, for travel to western states and $1,000.00 per day for all other states, and $250.00 per hour when offering testimony. I have testified and/or provided depositions in the following cases which are generally related to the subject of the instant litigation in the past four years: *Estate of Scruggs v. Turnbow et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Northern Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force and wrongful death; *Nielson v.*

*South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct; *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive use of force; *Harman & Overton v. Utah Department of Public Safety*, Case No. 2:03CV00558TC, United States District Court of Utah, Central Division, 2007. Deposition testimony given on behalf of the defendants. Subject matter: wrongful execution of a search warrant, negligent investigation; *Herring v. City of Colorado Springs*, Civil No. 04-CV-024229-PAC-BNB, United States District Court of Colorado, 2005. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force, wrongful death; *Walker v. Orem Department of Public Safety*, Case No. 2:02-CV-0253, United States District Court of Utah, Central Division, 2004. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force, wrongful death. This list is accurate for dates between August 30, 2004, and August 30, 2008.

10.    In the instant matter, I have relied upon the documents, photographs, video recording, records, reports, depositions, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, as well as my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.    Summary of reported facts and conclusions:

1. On May 14, 2005, Officer Jason Bateman ("Bateman") noticed a blue 1995 Mercury Sable sedan being operated with a cracked windshield, a violation of Utah law. The blue sedan was being operated by a man later identified as David H. Becker ("Becker"). Bateman decided to stop the blue sedan to discuss the windshield violation with the driver.

2. Bateman turned on his overhead emergency lights. When the blue sedan did not promptly stop, Bateman sounded the siren a couple of times. The blue sedan stopped in the parking lot of the Day's Supermarket at 890 South Main Street in Heber, Utah. Just after stopping in the traffic path of the parking lot, the blue sedan's driver opened the driver side door. Bateman approached the driver and asked for the driver's driver license and vehicle registration information. The driver identified himself as "Dave Becker" and provided his date of birth, but not a driver license.

3. Becker asked Bateman about the reason for the traffic stop, a question that Becker repeated numerous times during his conversation with Bateman. Bateman told Becker that he stopped him due to a cracked windshield. During the initial conversation, Bateman detected an odor of alcoholic beverage on Becker's breath. Bateman asked Becker to step out of the blue sedan and Becker initially failed to comply. Bateman then instructed Becker to walk to the back of Becker's car to facilitate the administration of field sobriety tests in an area outside of the travel path and between the patrol car and Becker's car.

4. Becker was holding papers. Bateman asked Becker to put them down and Becker dropped one of them to the ground. Bateman said that he would pick it up. Bateman took the remainder of the papers and put them on the sedan trunk, and then on the front seat of the sedan. During these moments, Becker continued to ask the reason for the stop, despite Bateman having told Becker several times that he was stopped because of the windshield violation. Bateman asked Becker several times about how much alcohol Becker had consumed, each time receiving either no answer or a non-responsive answer.

5. Becker performed no standard field sobriety tests, though Bateman attempted to instruct Becker on the horizontal gaze nystagmus test and the nine-step walk and turn test. Nonetheless, there were several indicators that Becker was sufficiently under the influence of alcohol and that he could not safely operate a vehicle. Becker had the odor of alcohol, appeared confused and non-responsive to questions, and had glassy and bloodshot eyes and poor balance. Bateman decided to arrest Becker and informed Becker three times that he was under arrest.

6. Becker pulled away as Bateman attempted to apply a wrist control hold. As Becker pulled away, he put his hands on his car trunk to stabilize himself in his effort to escape control. Becker, who significantly outweighed Bateman, used his momentum and mass to pin Bateman's arm forward. Becker tightened his muscles and spread his legs in an apparent attempt to maximize the force of his resistence to Bateman's attempt to gain arrest control. Bateman realized that his arrest control hold was not effective and began to apply force to Becker's shoulder,

attempting to take Becker to the ground in order to apply a prone control technique. Bateman and Becker fell together, hitting the ground. Becker apparently struck his head and temporarily lost consciousness. Bateman promptly called for medical assistance and offered first aid, assisted by a bystander who stated that he was an emergency medical technician.

b.     Heber City Police Department Policy Number Six, Use of Force (the "policy" or "use of force policy"), provides:

> This department recognizes and respects the value and special integrity of each human life. Investing police officers with the lawful authority to use force to protect the public welfare requires a careful balancing of all human interests. Police officers have been delegated the awesome responsibility to protect life and property and apprehend criminal offenders. The apprehension of criminal offenders and protection of property must at all times be subservient to the protection of life. The officer's responsibility for protecting life must include his own. Therefore, it is the policy of this department that police officers shall use only that force which is reasonably necessary to effectively bring an incident under control while protecting the life of the officer or another.
>
> When the use of force is necessary and appropriate police officers shall, to the extent possible, utilize an escalating scale of options and will not employ a more forceful measure unless it is determined that a lower level of force would not be adequate. The scale of options is as follows:
>> A. Presence of police officer properly identified or in uniform.
>> B. Verbal persuasion.
>> C. Physical strength, i.e., come-along, wrist lock, control holds.
>> D. Department approved aerosol defense tools and other non-lethal weapons, including Tasers or IEDs.
>> E. Department approved firearms.
>
> Officers need not necessarily try each option before escalating to the next. Good judgment in each situation will dictate at which level an officer will start. Officers using any type of force are accountable for its use.

c.  This policy generally follows one of several police force models widely accepted in United States, Canadian and British police agencies. Though many terms are applied, it is most commonly termed a "force continuum." Dr. Kevin Parsons, one of the academics who gave early definition to this model, noted that it is merely a tool for an officer to explain a particular choice of force options. It does not "require an officer to 'attempt each level of force before going to the next level.' This has never been a part of the continuum process. In fact, it is the continuum which allows an officer to explain why a particular level of force was utilized instead of a lower level." 22 *Police & Security News* 1, 3 (January 2006).

d.  Heber City Police Department Policy Number Six, Use of Force (the "policy" or "use of force policy"), meets or exceeds constitutional standards governing use of force by police clearly established by the United States Supreme Court and the policy meets or exceeds statutory standards governing use of force by police established by the Utah State Legislature.

e.  The Heber City Police Department use of force policy incorporates constitutional principles articulated in Utah Code Ann. § 76-2-404, *Graham v. Connor*, 490 U.S. 386 (1989) and *Sacramento v. Lewis*, 523 U.S. 833 (1998). The Heber City Police Department's policy is to "use only that force which is reasonably necessary to effectively bring a situation under control while protecting the life of the officer or another."

f.  In 1999, the State of Utah joined several other states in facilitating the Police Corps program. The Police Corps enlisted Lew Hicks of the Hicks Training System to design a new approach to arrest control techniques and tactics to be taught in the nation's Police

Corps academies. The Utah Police Academy sent instructors to the Hicks' training center to complete train-the-trainer courses. When those trainers returned to the Utah Police Academy, I observed the new system being taught on many occasions.

g.    After two years of experience and evaluation with the techniques taught under the Hicks' model, the Utah Policy Academy administration decided to modify the defensive tactics and arrest control training provided to Basic Training police cadets. I participated in these policy discussions and then participated in the course as taught to Basic Training cadets. The Utah Police Academy directly delivers Basic Training to hundreds of police cadets each year and is also responsible for the curriculum mandated for all other Utah police academies located at various colleges and universities throughout the state. All Basic Training police cadets receive the same defensive tactics and arrest control training, no matter which academy provides the training.

h.    A modification to the Utah Police Academy defensive tactics and arrest control training occurred in 2001. The techniques of "ground-fighting" were increasingly taught. Though techniques for taking a person to a prone control position had been previously taught for many years, the defensive tactics and arrest control training was modified to teach that all control techniques may intensify to the point of prone control. Each of the arrest control techniques are designed with the minimum reasonable force initially applied, to be increased as the suspect increases resistence or attempts escape. Officers are taught that prone control promises maximum control for resistive suspects subjected to arrest control techniques. This is colloquially known as taking a suspect "to the ground."

i.  Bateman reasonably believed that Becker was committing a violation of Utah law by operating his vehicle while under the influence of alcohol to the degree that he could not safely operate the vehicle. This is a crime that endangers public safety and virtually always requires a custodial arrest. In most cases, the arrestee must be processed in the local jail and a breath and/or blood test is administered. Most law enforcement agencies mandate a custodial arrest so that the arrested driver may be subsequently released under circumstances discouraging or obviating driving again while still unlawfully under the influence. Moreover, many courts judicially mandate custodial arrests and booking for misdemeanor alcohol offenses.

j.  Bateman made several attempts to negotiate voluntary compliance from Becker. Bateman asked Becker to perform field sobriety tests, asked Becker to tell him how much alcohol he had consumed that day, and told Becker that he was under arrest. Becker was both passively non-compliant, progressing to actively non-compliant. Becker did not provide an accurate name, did not comply with field sobriety test instructions, would not engage in rational conversation, and did not submit to arrest.

k.  Becker's behavior provided several indicators that would alert a reasonable police officer that Becker could present a danger to an officer. Immediately after stopping, Becker opened his driver side door and pivoted in the seat. Though there may be multiple reasonable explanations for this, it may also signal that Becker was contemplating an attack against the officer. Becker was apparently under the influence of alcohol. Persons under the influence of alcohol are often unpredictable and may be more inclined to physically confront an officer. Becker provided a relatively common name, including

giving only a diminutive first name. This may be an indication of providing a false name, a scheme often employed by persons who know that they are the subjects of arrest warrants, parole violation warrants, and/or suspended driver licenses. Becker also avoided giving more detailed information about how his name appeared on his driver license. Becker mentioned prison, suggesting that he had committed crimes that were sufficiently serious to warrant incarceration at the state prison, i.e., felony crimes. Becker would not stand where directed by Bateman. Physical proximity precedes an attack against an officer. Moreover, Becker followed Bateman back to Bateman's patrol car as Bateman was calling for back-up assistance on the police radio. Becker continued to press toward Bateman as Bateman told him to stand away, between the cars, while Bateman spoke on the police radio. Any one of these indicators could cause a reasonable police officer to be concerned for his or her safety. The combination of one or more could escalate that concern.

l.      By giving Becker lawful commands, Bateman initially attempted the lowest force level to seek compliance from Becker. However, even Bateman's commands were preceded by Bateman's respectful explanation of why Bateman had stopped Becker and polite, persuasive requests for documents and cooperation. Bateman moved to command language only when Becker refused to engage in appropriately responsive dialogue.

m.     Bateman did not apply physical force to Becker until it was apparent that Becker would not cooperate with arrest efforts. Bateman initially attempted to arrest Becker with application of a simple wrist lock technique. It appears from the video recording of the incident that Becker was sufficiently large and strong to pull out of the hold, and perhaps

sufficiently intoxicated to not feel the pain compliance application of the technique. Becker manipulates his body while pinning Bateman's arm and faces toward Bateman. At this point, a reasonable officer would recognize the inadvisability of a protracted struggle and would perceive the need to gain immediate control. Though Bateman considered attempting to pin Becker against the car and trying to hold him there until help can arrive, he reasonably recognized that Becker was continuing to resist. It would have been reasonable to believe that Becker would attempt to escape any control efforts and to flee. In his then-apparent state of impairment, Becker would have presented a significant danger to the public, particularly in the crowded parking lot, and to himself.

n.     Bateman made the reasonable decision to attempt prone control. When an arrestee is actively resisting arrest efforts, prone control is nearly always superior to standing control techniques. Bateman applied force to Becker's arm, intending to push Becker to a prone position. This was a reasonable effort to achieve prone control, but did not conclude as intended. Becker fell quickly and struck his head. Bateman also fell, carried by Becker's weight and force, and struck the ground hard. A perfect technique to move a subject into a prone control position, as can be achieved upon proper training and under the ideal controlled conditions in a police academy gymnasium or a martial arts dojo, rarely happens in the course of dynamic arrest on the street. Though a perfect technique under ideal circumstances might not result in striking one's head on the ground, it is a risk of moving a person into a prone control position. Police officers are taught to use whatever leverage, force, or technique is reasonable to get a person to the ground so that prone control may be applied. Becker's head striking the pavement was a regrettable

consequence of his conduct and resistence. Bateman's application of force to place Becker on the ground to achieve prone control was a reasonable action.

o.  The use of force by Bateman against Becker complied with constitutional standards governing use of force by police clearly established by the United States Supreme Court.

p.  The Heber City Police Department, and virtually all of Utah's 29 sheriff's offices and nearly 150 police departments and state law enforcement agencies, rely on the Utah Police Academy or one of its satellite academies to provide the basic police training course spanning several months. Bateman successfully completed the basic police training course at the Utah Valley University satellite academy. The Heber City Police Department provides its own in-service training and also relies on outside sources for additional in-service training. Police officers must complete 40 hours of in-service training each year in a variety of subjects determined by the discretion of the law enforcement agency.

q.  Review of Bateman's training records shows that he completed the prescribed training hours for the year preceding this incident. Though already a certified law enforcement officer when hired by the Heber City Police Department, Bateman completed a comprehensive field training program just months prior to the encounter with Becker.

These observations and opinions are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, depositions, and reports, excepting those expressed as opinions and those conflicting one with another, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not

limited to, further deposition testimony or corrections to reported depositions, consideration of any further report submitted by plaintiff's expert or experts, and further investigation. I anticipate the possibility of supplementing this report upon completion of further depositions of witnesses in this matter and/or upon being provided with other documents, data and/or images.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, videotape, diagrams, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen charts, graphs, or illustrations created to better illustrate the aforementioned testimony.

## CONCLUSION

The use of force by Bateman against Becker was reasonable and appropriate due to Becker's lack of compliance with lawful orders and his resistive force. The use of force under these circumstances did not constitute excessive force. The Heber City Police use of force policy comports with constitutional and statutory provisions and reflects current best practices among regional and national law enforcement agencies. Officer Bateman was provided with reasonable and adequate training and his training meets applicable standards.

Kenneth R. Wallentine
August 30, 2008

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123