PETER STIRBA (Bar No. 3118)
MEB W. ANDERSON (Bar No. 10227)
BRET W. RAWSON (Bar No. 11083)
**STIRBA & ASSOCIATES**
215 South State Street, Suite 750
P.O. Box 810
Salt Lake City, Utah 84110-0810
Telephone: (801) 364-8300
Facsimile: (801) 364-8355
E-mail: manderson@stirba.com

*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARY K. BECKER, individually, and as the guardian of DAVID H. BECKER,<br><br>     Plaintiffs,<br><br>v.<br><br>JASON BATEMAN, in an individual and official capacity, EDWARD L. RHOADES, in an official capacity, and HEBER CITY CORPORATION,<br><br>     Defendants. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No. 2:07cv00311<br><br>Judge Clark Waddoups |

Defendants Jason Bateman, Edward L. Rhoades, and Heber City (together the

"Defendants"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby

submit the following Memorandum in Support of their Motion for Summary Judgment.

1

**MATERIAL UNDISPUTED FACTUAL ALLEGATIONS**

Initially, the facts in this matter can be in little doubt, as Officer Bateman's squad car was equipped with a dash-board camera which recorded the incident. *See Mecham v. Frazier*, 500 F.3d 1200, n.2 (10th Cir. 2007) (citing *Scott v. Harris*, 550 U.S. 372 (2007) (appending link to videotape to opinion, stating "We are happy to allow the videotape to speak for itself.")). In *Scott v. Harris*, the United States Supreme Court recognized that often in summary judgment motions the parties' factual accounts differ greatly, but in *Scott*, as here, there was a dashboard camera video, and the United States Supreme Court indicated that: "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction: it should have viewed the facts in the light depicted by the videotape." 550 U.S. at 380-81.

Here, regardless of whether the parties' recollection of events diverge, this Court should follow the direction of the United States Supreme Court and view the facts in this case in the light depicted by the dashboard camera videotape (hereinafter "Video"). *Id*.

**Excessive Force Claim:**

1.       On May 14, 2005, Officer Bateman of the Heber City Police Department attempts to pull over David Becker in the Day's Market parking lot. (Video 14:03:34) (The Video is attached hereto as "Exh. E.")

2.       Officer Bateman first sees Becker's car about two blocks earlier. (Dep. Officer Jason Bateman, p. 29, ln. 8-16.) (attached as "Exh. A.")

3.      After proceeding through a stop sign without stopping, Becker stops his vehicle. (Video 14:03:37)

4.      As Officer Bateman exits his vehicle, Becker swings the door open on his vehicle and attempts to get out of the vehicle.  (Video 14:03:46).

5.      Officer Bateman states:  "Hello, sir, I am pulling you over because of a cracked windshield."[1]  (Video 14:03:50).

6.      A conversation ensues regarding Becker's name, registration, drivers license, date of birth, and the cracked windshield.  (Video 14:03:54 to 14:04:40).

7.      Officer Bateman determines that he can smell alcohol on Becker's breath.  (Exh. A. p. 30, ln. 12-15.)

8.      Officer Bateman notices a ticket in Becker's car and inquires:  "What's that ticket for?" (Video 14:04:41).

9.      Becker responds:  "I have a DUI."  (14:04:43).

10.     At this point, Officer Bateman recollects that he arrested Becker previously for DUI.  (Exh. A, p. 31, ln. 19 – p. 35, ln. 2.)

11.     Officer Bateman asks:  "Have you had anything to drink today?"  (Video 14:04:47).

12.     Becker responds:  "That's not the deal."  (Video 14:04:49).

---

[1] Defendants have done their best to interpret the language from the Video.  The quoted language is a translation of what is clearly evidenced and audible on the videotape.  That said, there may be an occasional error.

13.	Officer Bateman again asks: "Well, have you had anything to drink today?" (Video 14:04:50).

14.	Becker responds: "No." (14:04:51).

15.	Officer Bateman asks: "None at all?" (Video 14:04:52).

16.	Becker responds: "Now, why are you pulling me over?" (Video 14:04:55).

17.	Officer Bateman responds: "Cracked windshield mister, this is the last time, cracked windshield, now how much have you had to drink today?" (Video 14:04:58).

18.	Becker responds: "No." (Video 14:04:59).

19.	Officer Bateman again asks: "How much have you had to drink today?" (Video 14:05:00).

20.	This line of questioning is asked two more times, with no response. (Video 14:05:05 to 14:05:10).

21.	Officer Bateman then states: "Step on out sir. Step on out of the car." (Video 14:05:12).

22.	Prior to exiting, Becker again states: "Why are you pulling me over?" (Video 14:05:24).

23.	Officer Bateman again responds: "Cracked windshield, step on out please, sir. For the last time, step on out." (Video 14:05:25 – 14:05:31).

24.	Twenty-two seconds after being asked to exit his vehicle, Becker finally exits his vehicle. (Exh. A, p. 36, ln. 18.)

25.     During this time, while waiting for Becker to exit the vehicle, Officer Bateman recalls that in the prior DUI stop with Becker, Bateman and another officer had to use some force to arrest Becker because Becker resisted, Officer Bateman accordingly determines he should call for backup in this situation.  (Exh. A, p. 31, ln. 19 – p. 35, ln. 2;) (Exh. A, p. 34, ln. 25 – p. 35, ln. 5.)

26.     Officer Bateman states:  "Okay, walk over here."  (Video 14:05:35).

27.     Officer Bateman questions Becker three more times about how much he has had to drink today, each time without any response to the questions.  (Video 14:05:43 – 14:05:03).

28.     Officer Bateman states:  "Alright, we'll skip that point.  Stand right here." Officer Bateman points to the rear corner of his vehicle as he walks back toward his patrol vehicle.  Officer Bateman has to ask Becker more than once to move.  (Video 14:06:06).

29.     At this point, it is obvious to Officer Bateman that Becker is impaired in some fashion.  Officer Bateman testified:  "I noticed that the odor of alcohol and repeated questions is a sign of intoxication.  Yes, he was - - I started to realize that he may be unsafe to drive a motor vehicle at this time."  (Exh. A., p. 37, ln. 1-10.)

30.     The reality is that Becker was significantly impaired, and in fact had a blood alcohol content of .27, over three times the legal limit in Utah.  (Exh. A, p. 73, ln. 3-7.)

31.     When Becker finally moves, he moves past the area where Officer Bateman directed him to stand and moves towards Officer Bateman, who is now near the door of his patrol vehicle.  (Video 14:06:12 – 14:06:16).

32. For about twelve seconds you cannot see either Becker or Officer Bateman in the screen. Becker is pleading with Officer Bateman, wanting to know why he was pulled over. Officer Bateman calls for backup. (14:06:22 – 14:06:34); (Exh. A, p. 39, ln. 10-25.)

33. Becker and Officer Bateman then reappear in the video, as Officer Bateman assists Becker with papers that he had in his hand, places these papers in the front seat of Becker's car, along with Becker's sunglasses. Becker still will not stand where Officer Bateman has directed him to stand. (Video 14:06:36 – 14:06:48); (Exh. A, p. 39, ln. 20 – p. 40, ln. 6.)

34. Officer Bateman again states: "Okay, for the last time, how much have you had to drink today?" (Video 14:06:50).

35. Again, after no response, Officer Bateman says: "Okay, we'll skip that. Turn around and face me." (Video 14:06:57).

36. Becker turns, and Officer Bateman performs a field sobriety test on Becker. (Video 14:07:00 – 14:07:40).

37. Officer Bateman inquires whether Becker has any problems with his eyes, and Becker responds yes, and explains that he has one contact in, and one contact out. (Exh. A, p. 40, ln. 17-20.)

38. Officer Bateman verbally inquires at least twice whether Becker wants to perform the eye test, and each time Becker responds with continued pleading about why Officer Bateman is doing this. (Video 14:07:00 – 14:07:40).

39.     Becker then states something about going to prison.  Officer Bateman responds:

"Okay, well let's not talk about prison.  Who knows if you are going under arrest?"  (Exh. A, p.

42, ln. 3-6;) (Video 14:07:28 – 14:07:31).

40.     Officer Bateman then again asks:  "How much have you had to drink?," to which

Becker again responds:  "Why are you doing this?"  (Video 14:07:32 – 14:02:37).

41.     Becker insinuates that Officer Bateman has followed him down here from his

house.  (Video 14:07:40).

42.     Officer Bateman then attempts to get Becker to perform a heel-to-toe field

sobriety test.  (Video 14:07:41 – 14:08:00); (Exh. A, p. 42, ln. 7-15.)

43.     Becker responds:  "I've got a videotape of this."  (Video 14:07:46).

44.     Officer Bateman states:  "I know you've got a videotape of this," and moves

towards Becker, Becker places his left arm behind his back so that Officer Bateman cannot take

hold of it. (Video 14:07:49).

45.     Officer Bateman testified that: "He's got his arm behind [him], which is not good.

. . . I haven't searched him.  You want - - one of the biggest things in training is you always want

to see the hands.  Hands are what hurt you."  (Exh. A, p. 57, ln. 23 – p. 58, ln. 6.)

46.     Officer Bateman then states to Becker:  "You've got one last chance, you can do

these field sobriety tests . . ."  (Video 14:07:54).

47.     Becker retorts about his wife having to get him out of prison.  (Video 14:07:59).

48.     Officer Bateman moves towards Becker to place him under arrest.  (Video

14:08:01).

49.     Officer Bateman testified that at this point the proper way to arrest Becker was to:

"Spin him around to where - - turn him around to where he's facing the vehicle, have him put his

hands behind his back, you know, put him in handcuffs, pat him down, and go from there."

(Exh. A, p. 43, ln. 6-9.)

50.     As Officer Bateman attempts to move Becker so that he is facing his vehicle,

Becker resists arrest.  (Exh. A, p. 44, ln. 2-6;) (Video 14:08:01 – 14:08:04).

51.     "I have his hand in mine attempting to do a twist lock or an ACT move."  (Exh.

A, p. 44, ln. 16-17.)

52.     He moves Becker around so that he is forward facing toward his vehicle, takes

Becker's right arm and states:  "You are under arrest."  (Video 14:08:05).

53.     Becker immediately cocks his right arm in a manner that does not allow Officer

Bateman to place him in restraints, and verbally responds:  "No."  (Video 14:08:05).

54.     During his deposition Officer Bateman testified that:

A.      He pulls away and he's got me stopped.

Q.      What happened in the three-tenths of a second?  We are now at 14:08:07.
A.      He pulled his hand up and away.  My twist lock was not working.

Q.      Do you still have a hold of his hand?
A.      Yes, but I am not strong enough.  He's able to resist my twisting his hand.  You
        see my arm is flexed, I'm trying to, but it's not working.

Q.      So what are you going to do next?
A.      I am - - at this point I'm going to try to lean him up against the vehicle and wait
        until backup arrives or depending on what else happens.
. . .
Q.      Did you ever ask him to put his hands behind his back?
A.      I never got the chance.  He resisted.

8

. . .

Q.    Do you feel threatened at this point?

A.    I feel that I am losing control.

Q.    Do you feel threatened?

A.    I feel that the subject is taking advantage of the situation[,] which is a threat.

Q.    To who?

A.    To me.

Q.    In what way?

A.    He's twice my size. I have told him he's under arrest. He stated he doesn't want to go to prison. That means, in my opinion, he is going to do what he can to flee, possibly hop back in his vehicle. He - - I felt he was unsafe to drive. We are in a busy parking lot. He's fought with me once before. I'm by myself. I had an officer last time [we fought and] that took us two to put him in handcuffs. I felt very outnumbered.

Q.    Where were the keys to his car?

A.    In it.

Q.    You thought he was capable of fleeing at this point?

A.    I thought he was capable of overpowering me.

(Exh. A, p. 45, ln. 1 – p. 46, ln. 25.)

55.    Officer Bateman pauses, looks into Becker's eyes, and states: "You have two choices, be under arrest now, or do the tests." After Becker does not answer, Officer Bateman then again attempts to secure Becker. (Video 14:08:07).

56.    Officer Bateman testified that at this point:

A.    I'm behind him which is - - I'm behind him. He's pulled away. My hand was up there before, if you go back a little further. My hand comes off his and he spins away from me which puts my hand up by his face. He pulls away, pulls my hand towards - - towards him. He's facing me which is a no-no.

Q.    14:08:09.

A.    Uh-huh.

(Exh. A, p. 47, ln. 14-19.)

57.     Officer Bateman continued to testify:

Q.      [Y]ou give him a choice there, 'You are under arrest now or do the test.'  Do you give him a chance to do the test?

A.      He still pulls away from me, which is he didn't give me a verbal confirmation. Pull away to me, as in training, means no.  If they pull away from you, that means they want to resist. . . . By pulling away he responded as no.

(Exh. A, p. 60, ln. 15-25.)

58.     Becker evades the hold of Officer Bateman, and then quickly attempts to flee around the back rear corner of his vehicle, placing his hands away from Officer Bateman on the rear of his vehicle.  (Video 14:08:09 – 14:08:13).

59.     Officer Bateman testified as follows:

Q.      You have moved Mr. Becker toward the rear of the car?
A.      He's moving, I'm going with him.  It's kind of an equal resistance.

Q.      What's your next - - what are you going to do next?
A.      At that point, I feel for me the best way to take control so he doesn't flee or anything is take him to the ground.

Q.      So it's now your intention to take him down?
A.      Yes.

Q.      And we are at 14:08:12.

(Video was played.)

Q.      All right.  One hundredth of a second, you have done what?
A.      My hand was never all the way from behind.  He always has my hand kind of pinned between his hand and the belly most of the time.
         So at that point, I almost bear hug him almost, take him to the ground.  Hopefully that I can get - - which is a stronger move - - his hand twisted in a lock and lock his arm.  So instead of just a wrist lock, it's an elbow lock and a - - kind of a shoulder lock.

10

Q. Mr. Becker had both his hands on the hood of the car?
A. Yes.

Q. On the back hood of the car?
A. Yes, resisting.

Q. How is he resisting?
A. He's widened his stance, he's widened his hands against the trunk, which is where you - - if he just had his hands normal, it wouldn't be a resist. . . . But he's actually tightening up is the best way to put it.

(Exh. A, p. 48, ln. 6 – p. 49, ln. 17.)

60. Officer Bateman, in order to restrain Becker who is resisting arrest and fleeing from him, takes Becker in a bear hug, and takes him to the ground in a ground stabilization maneuver. (Video 14:08:14); (Exh. A, p. 49, ln. 23 – p. 50, ln. 1.)

61. "[W]hen we hit the ground, you see me immediately hop up to try to grab the wrist, get him in a better twist lock, and that's when I realize he's knocked out." (Exh. A, p. 52, ln. 1-4.)

62. Officer Bateman calls for 10-4 & 10-52, which is an ambulance transport. (Video 14:08:24); (Exh. A, p. 52, ln. 13.)

63. Becker was conscious when the ambulance arrived. (Exh. A, p. 83, ln. 4-5.)

64. David Becker has absolutely no recollection of the events that form the basis for this lawsuit, and that are seen on the Video. *See* (Dep. of David Becker, p. 5, ln 20-24; p.13, ln. 24-25 (plaintiffs' counsel objecting on basis that Becker "doesn't remember this day."); p.15, ln. 12-13) (attached as "Exh. H.")

65. Officer Bateman is POST certified. (Exh. A, p. 11, ln. 21 – p. 12, ln. 16.)

66.     The remainder of the Video after Becker is placed on the ground in a ground-control-maneuver and the ambulance is called at 14:08:24, is irrelevant to Becker's claims, but is included on the Video.

**Municipal Liability Claim**:

67.     Heber City Police Chief Rhoades has been in law enforcement for thirty years, the last ten as Chief of the Heber City P.D.  He is a POST graduate, and has worked patrol, as a sergeant, in investigations, and as a lieutenant with Roy City Police before becoming the Heber City Police Chief.  (Dep. Chief Rhoads, "Exh. B" p. 8, ln. 5-22 & p. 9, ln. 3-4.)

68.     The Heber City P.D. has a Policies and Procedures Manual that is a combination of other cities' policies, Heber City policies, and POST policies, and is combined into one Heber City Police Department Policies and Procedures ("Policies and Procedures").  (Exh. B p. 56, ln. 10-18; p. 59, ln. 9-15.)

69.     Heber City Police Officers are required to read the Polices and Procedures prior to being hired.  (*Id*.)

70.     The Policies and Procedures include a 'use of force' policy, as well as an 'arrest and custody' policy.  (Exh. B p. 4, ln. 3-4.)

71.     In May, 2005, at the time of this incident, the Heber City 'use of force' policy stated:  "It is the policy of this department that police officers shall use only that force which is reasonably necessary to effectively bring an incident under control while protecting the life of the officer or another."  (*Id*. p. 60, ln. 25 – p. 61, ln. 5 & p. 75, ln. 12-23.)

72.     Use of force is taught annually, and training participated in, by Heber City Police personnel.  (Exh. B p. 52, ln. 9;) (Dep. Mike Clegg, "Exh. C" p. 47, ln. 21 – p. 48, ln. 23.)

73.     Regarding the use of force, "not everything that POST has taught or anybody teaches you is going to work, so - - you know, it's not a magic thing. . . . There's - - they always want you to get them to the ground because that's - - you have more control when they're on the ground than standing up and less likely you're going to get punched in the face or kicked, and it's a lot safer for them."  (*Id.*)

74.     The Heber City P.D. requires its Officers to maintain required training hours, and utilizes POST training, as well as other in house training.  (Exh. A, p. 21, ln. 4-6 & p. 22, ln. 6-9;) (Exh. B p. 52, ln. 9;) (Exh. C, p. 5, ln. 18 – p. 6, ln. 3;) (Dep. Bunnell, "Exh. D" p. 9, ln. 20-21 (counsel for Plaintiff indicating "I noticed just walking in here [Heber City Police Department] there's a lot of officers around because there's some training[.]").)

75.     Heber City has a protocol and procedure for conducting internal investigations, and in a 'use of force' situation, the Sergeants sit down together, review policy and assess that policy was followed.  (Exh. C. p. 51, ln. 20 – p. 52, ln. 9.)

76.     In this case, Sergeant Clegg, Sergeant Rose, and attorney Mark Smedley completed such an internal investigation, and determined that Officer Bateman followed Policies and Procedures.  (*Id.* at p. 57, ln. 8-11;) (Exh. B p. 67, ln. 2-5.)

77.     Chief Rhoades viewed the Videotape and felt Officer Bateman correctly followed Polices and Procedures, and that he was authoritative in trying to get Becker to respond.  (Exh. B p. 68, ln. 4-16.)

78.     Chief Rhoades testified that:  "Mr. Becker was resisting, the officer tried to get a twist lock or a wristlock on him, he resisted, he pulled his hand loose.  Officer Bateman did an underhand around the arm and brought him to the ground.  It's a technique that's taught in - - one of those techniques that - - to get a person physically under control. . . . I don't see where he used more force than was necessary to effect the arrest."  (Exh. B p. 70, ln. 19-25 – p. 72, ln. 25.)

79.     POST teaches this under-hand-around-the-arm ground control or ground stabilization arrest technique.  (*Id*. p. 71, ln. 4-5.)

80.     A hiring policy is included in the Heber City Policies and Procedures Manual. (Exh. B, p. 4, ln 4.)

81.     Heber City Police hired Officer Bateman at a time when he was currently employed by Wasatch County.  (Exh. B p. 22, ln. 20-23.)

82.     Officer Bateman ranked number one in the testing of applicants for the position with the Heber City Police, and was hired by Heber City in 2004.  (Exh. B p. 12, ln. 4-5.)

83.     The testing of applicants included:

Testing procedure is - - they're required to come in and they spend about a half a day doing written tests and a physical agility test.  Then they're run through a board of review and then they're - - the three highest for one position is picked out of the board of review, background checks are done on the three highest.  At that point, they have an interview with me and sometimes a second person and other sergeant or something, and from that interview we decide out of the three highest which would be the best officer for hiring for Heber City.

(Exh. B p. 12, ln. 7-22.)

84.     "The background check officers - - a detective will follow up on references and contacts that we can make contact with to see what the person's like[.]"  (Exh. B p. 13, ln. 13-15.)

85.     The background check also includes checking into prior employment.  (*Id*. at p. 14, ln. 7-9.)

86.     A background check was conducted on Officer Bateman prior to his being hired by Heber City Police.  (Exh. B p. 19, ln 22 – p. 20, ln. 3 (Deputy Sheriff with Wasatch County indicated "Jason Bateman was a good worker, a good officer and would rehire him if he had the opportunity.").)

87.     When Heber City Police hired Officer Bateman, Chief Rhoades requested training records from Wasatch County regarding Officer Bateman, but received no records of any kind from Wasatch County, and reviewed no records from Wasatch County prior to hiring Officer Bateman.  (Exh. B p. 31, ln. 31 & p. 39, ln. 19 – p. 40, ln. 1.)

88.     Heber City did obtain Officer Bateman's training records from POST.  (Exh. B p. 51, ln. 18-24.)

89.     Chief Rhoades had no concerns about hiring Officer Bateman.  (Exh. B p. 15, ln. 16-18.)  "He was the best applicant for the job.  He applied to us.  We didn't go search him out. He applied to us.  He was the top ticket writer in the county and top DUI enforcement officer in the county.  We got a golden ace."  (Exh. B, p. 23, ln. 5-9.)

<u>**ARGUMENT**</u>

**I.      Summary Judgment Standard.**

In general, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(c). Under this standard, "a mere factual dispute will not preclude summary judgment; instead there must be a ***genuine*** issue of ***material*** fact." *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)) (emphasis added). Further, when the Defendants' and the Plaintiffs' version of events clearly diverge, this Court need not blindly accept Plaintiffs' one-sided version of the events, but rather it is the "factual matrix" most favorable to the Plaintiff that this Court must consider. *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).

In other words, the non-moving party must provide evidence "such that a reasonable jury could return a verdict for the non-moving party." *Cooperman*, 214 F.3d at 1164 (10th Cir. 2000). This means the plaintiff must provide "significant probative evidence tending to support the complaint." *First Nat'l Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 290 (1968). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, as will be described immediately hereafter, motions for summary judgment which assert a defense of qualified immunity, place additional burdens on the ***plaintiff*** that are not found in the typical summary judgment setting. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995) (holding that "we

review summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings.").

## II.     Qualified Immunity Standard.

The United States Supreme Court recently held that:

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

> Because qualified immunity is an immunity from suit rather than a mere defense to liability it is effectively lost if a case is erroneously permitted to go to trial. . . . Accordingly, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

*Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (marks and citations omitted).

The Tenth Circuit has held that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir.2001). The Supreme Court has further held that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances []he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 599 (2004).

Once a defendant raises a qualified immunity defense, the plaintiff bears the heavy burden of proving (1) that the facts alleged make out a violation of a constitutional right, and (2)

that a reasonable officer would have known they were violating such a constitutional right. *Pearson*, 129 S.Ct. at 816; *see Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1515 (10th Cir. 1995) (holding that once the defendant adequately raised the qualified immunity defense the plaintiff must show that the law was clearly established when the alleged violation occurred and the plaintiff must present facts or allegations sufficient to show that the official violated that law); *see also Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (plaintiff must satisfy this "heavy two-part burden."). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Harrington*, 268 F.3d at 1186.

In *Pearson*, the United States Supreme Court recently abandoned the rigid two-step analytical qualified immunity framework required by *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001). "Unnecessary litigation of constitutional issues [] wastes the parties' resources." *Pearson*, 129 S.Ct. at 818. Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.

**III.     Plaintiffs Have Failed To Allege Any Underlying Constitutional Violation And Thus Defendants Are Entitled To Qualified Immunity On Their Claims.**

If Plaintiffs cannot establish the violation of a constitutional right, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled in part on other grounds).

### a) There Was No Excessive Force Violation (Fourth Amendment):

The Fourth Amendment's reasonableness standard applies to Becker's excessive force claims against Officer Bateman. *See Graham v. Connor*, 490 U.S. 386 (1989). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Further, "[p]olice officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a . . . stop." *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997) (marks and citations omitted).

When analyzing an excessive force claim, the Court must view "a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see Hinton v. City of Elwood*, 997 F.2d 774, 780 (10th Cir. 1993). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (marks omitted).

The ultimate question in the excessive force analysis "is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id.* at 397 (marks omitted). This determination requires attention to the facts and circumstances of each particular case, "including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir.2007) (quoting *Graham*, 490 U.S. at 396). The "objective reasonableness" standard gives no regard to the officer's underlying intent or motivation. *Graham*, 490 U.S. at 397. In order for an officer's conduct to amount to excessive force, the conduct must be reckless as opposed to merely negligent. *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001). "[T]he reasonableness standard does not require that officers use alternative less intrusive means." *Id*. at 1133.

Here, the dashboard camera videotape evidences the totality of the circumstances Officer Bateman faced. The dashboard camera videotape evidences that Officer Bateman's conduct was objectively reasonable, and this Court can make such a determination on this record. "[T]he question of objective reasonableness is ***not*** for the jury to decide where the facts are uncontroverted." *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007). In other words, where there are no uncontroverted facts, the question of objective reasonableness "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, n.8 (2007).

The fact is, Becker was clearly resisting arrest, and acted in a manner that made it objectively reasonable for Officer Bateman to fear for his safety and others, as he was dealing with an entirely unpredictable and belligerent drunk who had just been driving a vehicle. The Tenth Circuit has held that individuals who are intoxicated are often unpredictable and add an additional layer of uncertainty to the situation. *Novitsky v. City Of Aurora*, 491 F.3d 1244, 1255 (10th Cir. 2007). Officer Bateman tried for over four minutes to get Becker to comply with any

of his commands.  (Statements of Fact, ¶ 4, 60.)  Becker resisted from the first moments of the

altercation, to the very end.  (*Id.*, ¶ 12, 54-58;) *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781

(10th Cir. 1993) (turning around and swearing at officer with no additional aggressive moves is

resisting arrest); *Mecham v. Frazier*, 500 F.3d 1200 (10th Cir. 2007) (sitting in car non-

responsive was resisting arrest).  Once the decision to arrest was made – which notably has not

been challenged as Becker was obviously driving while intoxicated  - Officer Bateman attempted

first to utilize a wrist or twist lock technique, a minimal amount of force.  (*Id.*, ¶ 51.)  "Once the

twist lock is applied, a person would not be able to walk away."  *Novitsky v. City Of Aurora*, 491

F.3d 1244, 1249 (10th Cir. 2007).  However, Becker evaded and resisted the attempted wrist or

twist lock, which immediately placed both Officer Bateman and others at significant risk.

(Statement of Facts, ¶¶ 53-54;) *see Mecham*, 500 F.3d at 1205 (holding that an officer could

reasonably be concerned of danger to himself and others where non-compliant suspect who was

not a flight risk had keys to car and control of car).  Becker's disregard of Officer Bateman's

instructions and the implausibility as to why Becker would not cooperate are also factors that

make Officer Bateman's use of force all the more reasonable.  *Mecham*, 500 F.3d at 1205.

     In *Novitsky*, the Tenth Circuit held:

> It is beyond dispute that the safety of law enforcement officers during the
> performance of their duties is a "legitimate and weighty" concern.  *Pennsylvania
> v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).
> Consequently, officers may use force during a Terry-type detention to the extent
> that "such steps [are] reasonably necessary to protect their personal safety and to
> maintain the status quo during the course of [the] stop."  *United States v. Hensley*,
> 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).  Under certain
> circumstances, the steps officers may permissibly take to protect their safety
> include drawing their weapons, placing a suspect in handcuffs, ***or forcing a***

> **suspect to the ground**.  *See United States v. Perdue*, 8 F.3d 1455, 1462 (10th
> Cir.1993) (collecting cases).

*Novitsky*, 491 F.3d at 1254 (emphasis added); *see also Gallegos v. City of Colorado Springs*, 114

F.3d 1024, 1030 (10th Cir. 1997) (noting that at least nine courts of appeals, including this

circuit, have determined the use of intrusive precautionary measures such as handcuffs or

**placing a suspect on the ground** is allowed during a *Terry* stop without turning it into an

arrest); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993) (Plaintiffs' own

expert testified that wrestling a defendant to the ground was proper procedure if a suspect is

resisting).  The Tenth Circuit has expressly held that any time officer safety is a concern, it is

objectively reasonable to place a suspect on the ground using a ground-control maneuver, as was

done by Officer Bateman.

In *Gallegos*, the Tenth Circuit analyzed a situation where **two** officers, as opposed to one,

confronted a man walking on the street to see if he was a prowler suspect. *Gallegos v. City of

Colorado Springs*, 114 F.3d 1024, 1026 (10th Cir. 1997).  Gallegos appeared intoxicated, but

was walking down the street.  Gallegos was unresponsive to the officers' questions.  *Id.*

Immediately, one of the officers grabbed Gallegos' arm.  *Id.*  Gallegos jerked away.  *Id.*  A

second attempt to grasp Gallegos' arm was unsuccessful.  *Id.*  The two officers then called for

backup.  *Id.*  On the third attempt to grasp Gallegos' arm, he jerked away and pivoted to face the

officers.  *Id.*  Reccall that Officer Bateman testified that when a suspect is facing you, it is a no-

no as far as officer safety is concerned.  (Statement of Facts, ¶ 56.)  One of the officers then

stepped back, and immediately moved in and applied an arm bar maneuver to Gallegos.  *Id.*

Upon observing this procedure, the other officer grabbed Gallegos and "initiated a take-down action to ensure Mr. Gallegos would not strike Officer Santos with his free arm." *Id*. The Tenth Circuit agreed with the District Court determination that "the take-down of Mr. Gallegos was justified by a reasonably perceived threat to officer safety." *Id*. at 1031.

It is exceedingly important that in *Gallegos* there were ***two*** officers involved with the inebriated suspect. It was the officer who was watching the interaction who made the split-second reasonable decision to take Gallegos to the pavement. Here, only officer Bateman was dealing with trying to arrest the belligerent drunk suspect, and was being forced to make split-second determinations about safety and force. Officer Bateman's taking a non-compliant, drunk suspect that was resisting arrest and creating officer and public safety concerns to the ground in a ground control maneuver was what he was trained to do in such a tense, rapidly evolving situation. (Statement of Facts, ¶ 78-79.) If the Tenth Circuit held that ***two*** officers had a reasonable belief that they need utilize a ground control maneuver on *Gallegos* and "bring Mr. Gallegos face-down on the pavement[,]" 114 F.3d at 1031, then certainly it was objectively reasonable for Officer Bateman to utilize a ground control maneuver to secure Becker.

The Ninth Circuit has also had occasion to determine that ***two*** officers' use of a take-down procedure to initiate an arrest was not excessive force. *Blackmore v. City of Phoenix*, 126 Fed.Appx. 778, 2005 WL 270331 (9th Cir.) (a copy of which is attached as "Exh. F.") In *Blackmore*, the Ninth Circuit noted that: "It is clear from the record, however, that Blackmore was refusing to obey the officers' commands that he leave the area where he was trespassing, and he then put his hand in his pocket and did not comply with the officers' instructions to take

his hand out." *Id.* at 781. "Deputy Rogers reasonably perceived Officer Arndt had ordered Blackmore to get his hand out of his pocket. Rogers did not have to wait to see what was in Blackmore's hand before taking Blackmore to the ground to protect everyone." *Id.* Here, Officer Bateman was faced with a similar situation when Becker placed his hand behind his back. (Statement of Facts, ¶¶ 44-45.) While we can certainly see that Becker's hand is empty on the Video, Officer Bateman cannot see this, and many people conceal weapons in their back pocket or seat of their pants. (Video 14:07:49). While Officer Bateman did not order Becker to move his hand, this is just another fact making Officer Bateman's ultimate decision to arrest and then utilize a ground control maneuver objectively reasonable. Again, securing a suspect on the ground when there is any safety concern is what Officer Bateman, and all officers, are trained to do. (Statement of Facts, ¶¶ 78-79.)

The Third Circuit has also determined that *two* officers wrestling a non-compliant suspect to the ground is objectively reasonable. *Feldman v. Community College of Allegheny*, 85 Fed.Appx. 821, 2004 WL 50784 (3rd Cir.), 184 Ed. Law Rep. 736 (a copy of which is attached as "Exh. G.") "The record clearly shows that [suspect] was resisting arrest, first by telling the uniformed police officers that he would not leave until they showed him identification, and then by actively struggling when the officers attempted to remove him. In the ensuing struggle to handcuff him, Feldman claims that the officers 'wrestled' him to the ground and that one of them kicked him in the head." *Id.* at 826. The Third Circuit held that "even accepting Feldman's description of the arrest, the force resulted as part of the struggle and was not excessive in light of Feldman's physical resistance." *Id.* Again, two officers confronted the suspect and took him

to the ground, and a circuit court found the force objectively reasonable. Clearly, Officer Bateman's force utilized in the Video was objectively reasonable.

The United States District Court for the District of Vermont, in *Flanigan v. Town of Colchester*, 171 F.Supp.2d 361 (D. Vt. 2001), has also analyzed a situation similar to the one presented in the Video. While the ***two*** officers in *Flanigan* were dispatched to a neighborhood disturbance that allegedly involved a firearm, the officers quickly determined the firearm was a BB gun. *Id*. at 362. The officers also determined that Flanigan was incapacitated. Id. at 363. Flanigan was asked to submit to a breath test, but he refused. *Id*. Flanigan was then informed that he was going to be "taken into custody as an incapacitated person." *Id*. Flanigan was asked to place his hands behind his back, to which he initially cooperated. *Id*. However, as one of the officers was reaching for his handcuffs Flanigan said "no," and shook his hands. Flanigan took just a few steps away from the officer. *Id*. "[Officers] Allen and Jacobs both state that their law enforcement training requires them to immediately take to the ground and handcuff a person who becomes non-compliant while being placed into custody." *Id*. "Accordingly, as Flanigan was stepping away from him, Allen took him to the ground by knocking Flanigan's feet out from under him and grabbing him around the chest. Flanigan landed on his right side on the ground. Flanigan contends his shoulder, hip, and face hit the ground." *Id*.

In determining that the force used against Flanigan was objectively reasonable the District Court held that:

> Following the guidance set forth in *Graham*, it is clear that Allen acted with reasonable force under the circumstances. By shaking his hands free from Allen and moving away from him, Flanigan was actively evading the officers' attempts

to place him in protective custody.  Flanigan argues that he presented little risk of escape because "[t]here was nowhere for him to run." . . .

Moreover, as Flanigan broke away from him, Allen had reason to be concerned that the suddenly uncooperative Flanigan might present a danger to the officers, himself, or others. . . . Allen had also determined that Flanigan was incapacitated due to consumption of alcohol.  Thus, his behavior was likely to be uncontrollable and irrational.

*Id*. at 365.  Similarly, Officer Bateman was objectively reasonable in his belief that Becker was a danger to the officers, himself, and to others.  Thus, Becker had to be secured, and just as the officers in *Flanigan* testified, a ground control stabilization maneuver is what officers are taught to utilize to secure suspects in these types of situations.

The Video speaks for itself.  The situation Officer Bateman was presented with was just as tense, fast developing, and potentially dangerous as any of the cases cited above, all of which held that taking a non-compliant suspect to the ground was objectively reasonable.  Given the totality of the circumstances of what is seen on the Video, taking Becker to the ground was an objectively reasonable use of force.

**IV.     Any Alleged Excessive Force Violation Was Not Clearly Established.**

In 2007, the Tenth Circuit held that:  "[T]he risks presented by potentially intoxicated individuals are inherently fact-dependent and the extent to which an officer may use force in such situations has not been definitively answered by this circuit."  *Novitsky v. City Of Aurora*, 491 F.3d 1244, 1257 (2007).  Here, it cannot be disputed that Becker's blood alcohol content was .27.  It is undisputed that Becker is intoxicated.  (Statement of Facts, ¶ 30.)  In light of the 2007 *Novitsky* holding regarding the Tenth Circuit not having stated definitively how much force an

officer may use with a potentially intoxicated person, there can be no doubt that in May of 2005, any violation of Becker's constitutional right to be free from excessive force was in no way clearly established in the Tenth Circuit.

Under the recent Supreme Court decision in *Pearson v. Callahan*, the fact that the law was not clearly established, absolutely warrants qualified immunity for Officer Bateman, and could end this Court's inquiry without the Court making any determination as to whether there was any constitutional violation.  However, *Pearson* reasoned that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decision[]making [that] will best facilitate the fair and efficient disposition of each case."  *Pearson v. Callahan*, 129 S.Ct. 808, 821 (2009).

Defendants submit that this is a case where the Court should address the constitutionality of the incident between Becker and Officer Bateman, even though it is obvious that qualified immunity applies regardless.  The reason this Court should address the first prong of the *Saucier* qualified immunity analysis is that a favorable constitutional ruling disposes of Plaintiffs' municipal liability claims as a matter of law. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Further, in light of the Video, and the cases cited above, the force used to control Becker in this incident was clearly objectively reasonable, and this Court should vindicate Officer Bateman.

**V.      Defendants Rhoads and Heber City Are Entitled To Summary Judgment.**

Plaintiffs' claim against Defendant Rhoades is brought only against him in his official capacity. Thus, the claim against Chief Rhoades and Heber City are one and the same. A case brought against a policymaker, is, for all intents and purposes, the same as a suit against the government entity. *Thompson v. City of Lawrence, Kan.,* 58 F.3d 1511, 1517 (10th Cir. 1995) (holding that "[a] suit against a city official in his official capacity is no different form a suit against the City itself.").

Heber City "may not be held liable under [a municipal liability] theory, . . . if there are no underlying constitutional violations by its officers." *Id*.; *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Here, Plaintiffs' claim relies on an alleged constitutional violation of utilizing excessive force. However, as was shown above, there simply was no excessive force constitutional violation here. Thus, there is no municipal liability, as a matter of law.

Plaintiffs' municipal liability claims fail as a matter of law, because Plaintiffs have alleged no constitutional injury. It was objectively reasonable for Officer Bateman to control Becker with a ground control maneuver. Notwithstanding, to the extent the Court desires to review Plaintiffs' municipal liability claims, Plaintiffs fail to meet the burden necessary to prevail at the summary judgment phase on these claims. "Regardless of whether [Becker] alleges an official policy or an unwritten custom, at the summary judgment stage he must set forth specific facts supporting this allegation." *Flanigan*, 171 F.Supp.2d at 368. Plaintiff must show a deliberate decision to adopt an unconstitutional policy, or deliberate indifference to unconstitutional conduct. *Id*. Regardless, even if Heber City had such a policy, which they do

not, "a policy of taking someone to the ground when he or she defies arrest is not facially unconstitutional." *Id.*

### a) Heber City Has No Unconstitutional Policies, Practices, And Customs That Have Led To Any Failure To Stop The Use Of Excessive Force; Failure To Discipline, Reprimand, Teach, Or Discharge Its Police Officers; Failure To Adequately Hire, Retain, Train, Educate, Monitor, And/Or Supervise.

"[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "The C[ity] may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

Whereas here, "the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of ***deliberate indifference*** to the rights of its inhabitants." *Id.* (emphasis added) (marks removed). "[A] municipality is liable only where the official policy is the moving force behind the injury alleged. That is, a ***plaintiff must show*** that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights." *Barney*, 143 F.3d at 1307 (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397 (1997)) (emphasis added) (marks removed).

Generally, the Heber City P.D. has a Policies and Procedures Manual that is a combination of other cities' policies, Heber City policies, and POST policies, and is combined together into the Policies and Procedures. (Statement of Facts, ¶ 68.) Plaintiff cannot show one policy from the Policies and Procedures that exhibits deliberate indifference.

Specifically, "municipal liability based on a policy of inadequate training requires proof of the municipality's deliberate indifference to its inhabitants – i.e., the failure to train must reflect a deliberate or conscience choice by a municipality." *Id*. (citations and marks omitted). Here, "[t]he Heber City P.D. requires its Officers to maintain required training hours, and utilizes POST training, as well as other in house training." (Statement of Facts, ¶ 74.) This fact, in and of itself, precludes any claim of Heber City undertaking a deliberate or conscience choice of inadequate training. Rather, the fact is, Heber City requires adequate training, and "[u]se of force is taught annually, and training participated in, by Heber City Police personnel." (*Id*. at ¶ 72.)

Municipal liability based on "negligent hiring" or "an official's failure to carefully scrutinize an application for employment poses the 'greatest risk' that a municipality will be held liable for the actions of its employees rather than its own actions, since every injury inflicted by a municipal employee can be traced to hiring in a but-for sense." *Barney*, 143 F.3d at 1308. A Plaintiff "cannot support a claim for negligent hiring and retention without some showing the individuals hired and retained participated in wrongful conduct." *Mitchell v. City of Moore*, Oklahoma, 218 F.3d 1190, 1201 (10th Cir. 2000). Because Officer Bateman did not participate in any wrongful conduct, there can be no negligent hiring claim.

Further, "when reviewing hiring decisions, courts must take even greater care to adhere to stringent culpability and causation standards, and carefully test the link between the policymaker's hiring decision and the particular injury alleged." *Barney*, 143 F.3d at 1308 (marks omitted). "Merely showing that a municipal officer engaged in less than careful scrutiny of an applicant resulting in a generalized risk of harm is not enough to meet the rigorous requirements of 'deliberate indifference.'" *Id.* "Culpability requires a strong connection between the background of the particular applicant and the specific constitutional violation alleged." *Id.* "Establishing municipal liability in the hiring context requires a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff." *Id.*

Here, the facts indicate that when hiring Officer Bateman, a careful scrutiny of the applicant occurred, and there can be no link between any hiring decision and the particular injury alleged. For example, Heber City's hiring policy was followed; Officer Bateman ranked number one of all the applicants when he was hired; a background check was conducted; Officer Bateman's training records were received from POST; Officer Bateman was employed in law enforcement by Wasatch County and at least one superior there stated they would hire him back; and Officer Bateman's proven law enforcement record indicated Heber City was hiring a "golden ace." (Statement of Facts, ¶¶ 80-89.) Thus, there simply is no basis for a claim of negligent hiring, and most importantly, there has been no constitutional injury alleged.

Finally, the facts in this situation evidence that Heber City followed Policies and Procedures in reviewing this incident between Officer Bateman and Becker. Per policy, an internal investigation was completed, and Officer Bateman's objectively reasonable use of force

was found to comply with policy.  (Statement of Facts, ¶¶ 75-78.)  There was no negligent supervision, nor was there any negligent retention, or monitoring.  This incident was handled per policy.

Simply, Plaintiffs want to apply a *respondeat superior* theory to hold Heber City liable for the alleged unconstitutional actions of Officer Bateman, but the actions of Officer Bateman were absolutely objectively reasonable.  Thus, not only does Becker's excessive force claim fail as a matter of law, so does Becker's municipal liability claim, as not only was there no constitutional violation here, but Plaintiff Becker fails even to allege any otherwise deliberate indifference of any kind on the part of Heber City.

**VI.    Plaintiff Mary Becker's Loss of Consortium Claim Is Ripe For Dismissal.**

Ms. Becker has no "section 1983" loss of consortium claim, because Ms. Becker cannot allege any section 1983 cause of action.  *Berry v. City of Muskogee*, 900 F.2d 1489, 1506-07 (10th Cir.1990) (survivors not entitled to loss of consortium damages because section 1983 creates a federal remedy only for the party injured).  A section 1983 claim "is entirely personal to the direct victim of the alleged constitutional tort."  *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir.2000).  Accordingly, only David Becker may bring a section 1983 action, so Ms. Becker has absolutely no cause of action for loss of consortium pursuant to 42 U.S.C. § 1983.  Ms. Becker's loss of consortium claim is pled as a state law claim brought pursuant to Utah Code Ann. § 30-2-11, however there is no other state law claim asserted.  Thus, Becker's only asserted injury is his constitutional violation.

This Court should exercise supplemental jurisdiction and dismiss this claim because it is barred. *See Clark v. Edmunds*, 513 F.3d 1219, 1221 (10th Cir. 2008). Initially, Utah Code Ann. § 30-2-11(4) clearly indicates that: "A claim for the spouse's loss of consortium shall be: . . . subject to the same defenses, limitations, immunities, and provisions applicable to the claims of the injured person." Further, "[t]he spouse's action for loss of consortium: . . . may not exist in cases where the injured person would not have a cause of action." Utah Code Ann. § 30-2-11(5). Accordingly, as this matter has been pled, if David Becker has no constitutional claim because of qualified immunity (regardless of whether there was a violation that was not clearly established), Ms. Becker has no loss of consortium claim. Thus, dismissal of Ms. Becker's claim is warranted.

The Utah Governmental Immunity Act (UGIA) also precludes Ms. Becker's claim for loss of consortium made under state law, specifically Utah Code Ann. § 63G-7-301(5)(b) (2009).[2] The UGIA clearly states that "immunity from suit of each governmental entity is not waived . . . if the injury arises out of, in connection with, or results from: (b) . . . infliction of mental anguish, or violation of civil rights[.] Accordingly, Plaintiff's state law loss of consortium claim is barred.

_____

[2] At the time of the incident in this matter the UGIA section applicable was Utah Code Ann. § 63-30-10(2).

DATED this 29th day of May 2009.

**STIRBA & ASSOCIATES**


By: /s Meb W. Anderson
      PETER STIRBA
      MEB W. ANDERSON
      BRET W. RAWSON
      ***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of May 2009, I caused to be served a true copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** by the method indicated below, to the following:

| | |
|---|---|
| Beatrice M. Peck<br>TOMSIC & PECK<br>136 East South Temple, Suite 800<br>Salt Lake City, UT 84111 | ( ) U.S. Mail, Postage Prepaid<br>( ) Hand Delivered<br>( ) Facsimile<br>(X) E-file |
| Steve Russell<br>EISENBERG, GILCHRIST & MORTON<br>215 South State Street, Suite 900<br>Salt Lake City, UT 84111 | ( ) U.S. Mail, Postage Prepaid<br>( ) Hand Delivered<br>( ) Facsimile<br>(X) E-file |

＿＿／s Meb W. Anderson