# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
-ooOoo-

| | |
|---|---|
| MARY K. BECKER, individually, and as the guardian of DAVID H. BECKER,<br><br>Plaintiff,<br><br>v.<br><br>JASON BATEMAN, in an individual and official capacity, EDWARD L. RHOADES, in an official capacity, and HEBER CITY CORPORATION,<br><br>Defendants. | Civil No. 2:07-cv-311 PGC<br><br>VIDEOTAPE DEPOSITION OF:<br>**JASON BATEMAN**<br><br>TAKEN: May 9, 2008<br><br>Judge Paul G. Cassell |



-ooOoo-

        Videotape deposition of JASON BATEMAN, taken on behalf of the Plaintiff, at the offices of Eisenberg & Gilchrist, 215 South State Street, Suite 900, Salt Lake City, Utah, before Jill C. Dunford, Certified Shorthand Reporter and Notary Public in and for the State of Utah, videotaped by Alyse Largin, pursuant to Notice.

-ooOoo-

COPY




reporters inc.

Reporters, Inc.  10 West 100 South, Suite 250 · Salt Lake City, Utah 84101
(801) 746-5080 phone · (801) 746-5083 fax · 1-866-310-DEPO · www.reportersinc.net

1          A.   It's basically for self-sponsored people.

2   You go -- I went Tuesday through Friday from five to ten

3   at night and then all day Saturday from the first part

4   which made you SFO was September until around the first

5   of December.   And then the law enforcement part was first

6   part of January till May.

7          Q.   What does SFO stand for?

8          A.   Special Functions Officer.

9          Q.   And if you -- did you --

10         A.   Yes, I graduated.

11         Q.   -- graduate from the police academy?

12         A.   Yes.

13         Q.   And what does that entitle you to, if

14  anything?

15         A.   A law enforcement job.   It's the same as

16  Utah's POST.   It's just done at night.   POST instructors,

17  it's the same thing.

18         Q.   All right.

19         A.   It's just for self-sponsored people that have

20  to work while going to the academy.

21         Q.   And did you also attend POST?

22         A.   POST UVSC.

23         Q.   All right.

24         A.   Not Salt Lake POST, no.

25         Q.   When did you graduate from that?

1        A.  May 26, '99.

2        Q.  Did you get some sort of certificate?

3        A.  Yes, a POST certificate.

4        Q.  And tell me briefly what kind of training you

5   received at the UVSC POST.

6        A.  Report writing, ACT, evasive driving, patrol

7   skills, firearms, baton, base, same as you would as POST,

8   it's just over a more extended time.

9        Q.  What is ACT?

10       A.  Arrest Control Techniques.

11       Q.  Do you remember who taught that?

12       A.  One of them was -- I think his first name is

13   Steve.  He's Nielsen.  He's with American Fork Police

14   Department.  And then I only know the first guy's name's

15   Terry.  He used to be with American Fork and then he was

16   with the Department of Corrections.

17       Q.  Do you know where he is now?

18       A.  Last I talked to him was the Department of

19   Corrections, but he was close to retiring.  He was their

20   main person then.

21       Q.  And was it Steve Nelson or Nielsen?

22       A.  Nielsen.  Last I knew, he was on the motors

23   -- a sergeant on the motors for American Fork.

24       Q.  Does that mean patrol?

25       A.  Motorcycles.

1    County?

2          A.   Put on probation at Wasatch County, probably

3    2002 maybe.

4          Q.   After getting out of UVSC POST, have you

5    continued to take training in other courses?

6          A.   Yes.

7          Q.   Have you received any additional training in

8    suspect control and ACT?

9          A.   Yes.

10         Q.   Do you know when and where?

11         A.   It's all been in Heber.   The instructor was

12   Jim Moore, Sergeant Jim Moore with Heber City.

13         Q.   He's the in-house guy, right?

14         A.   Yeah, he's the in-house.

15         Q.   So no additional outside training?

16         A.   No.   He's a POST instructor, that I remember.

17         Q.   Just give me one second here.

18         We also received in discovery documents from

19   Heber City.

20         A.   Okay.

21         Q.   So that's what I'm referring to.   Let me just

22   show you these.   I won't make this an exhibit, but it's

23   called Heber City Police Department Training Record.   And

24   it seems to go year by year.

25         A.   I have never seen it.   I have never seen it

1  before.

2       Q.  So you don't -- you haven't seen your

3  training record?

4       A.  No.  I just turn in a slip that says I went

5  to this training and they do the rest.

6       Q.  Take a look at that and see if it makes sense

7  to you, if that looks like your training record.  And

8  that's for 2006, '07.

9       A.  Okay.

10          (Witness reviewed document.)

11      A.  Yeah, that makes sense.

12      Q.  Okay.  So in the same kind of record for '05,

13  '06, what's the calendar year they use there in Heber?

14      A.  Ours is July to July.  And I think POST

15  records you have to have your 40 hours in July to July

16  also.

17      Q.  Okay.

18      A.  I'm not sure about POST.

19      Q.  In 2005 to '06, it lists -- I'll show it to

20  you if you want to see it -- a class called Defensive

21  Tactics WHS, March 14, 2006.

22      A.  Yeah, they changed ACT to do Defensive

23  Tactics.  That's another name for it.

24          MR. STIRBA:  This is what counsel is

25  referring to.

1  time?

2        A.   I don't know how to change it.  So if the

3  times change or whatever, I don't know if that's

4  accurate.

5        Q.   Now, what's happening as the video starts?

6        A.   That is me pulling -- trying to pull him

7  over.

8        Q.   Where did you first see the vehicle?

9        A.   Approximately Sixth South and approximately

10  100 West.

11        Q.   And how far from that is it to where you are

12  now?

13        A.   Days Market is, if I believe so, 800 South.

14  This back side is 800 South 100 West.

15        Q.   So a couple of blocks?

16        A.   Yeah, two blocks.

17        Q.   And what drew your attention to the vehicle?

18        A.   A cracked windshield.

19        Q.   Did you recognize the vehicle?

20        A.   No.

21        Q.   Okay, we'll start again.

22              (Video was played.)

23        Q.   All right.  14:04:24.  You have asked him --

24  you told him why you pulled him over, right?

25        A.   Yes.

1          Q.   You have asked him his name?

2          A.   Yes.

3          Q.   He responded?

4          A.   Yes.

5          Q.   You asked him about his driver's license.  He

6     responded?

7          A.   Yes.

8          Q.   And he wants to know if the reason why you

9     really pulled him over is because of the windshield and

10    you said yes, it is, right?

11         A.   Yes.  Yes.

12         Q.   Do you have any impressions of Becker at this

13    point?

14         A.   I could smell the alcohol and he's asked me

15    the same question twice.

16         Q.   At this point do you recall any previous

17    dealings with David Becker?

18         A.   He does look familiar.  I'm not quite sure

19    who it is, but he does look familiar.

20         Q.   Do you recall arresting David Becker in

21    December of 2004?

22         A.   At this time?

23         Q.   Yes.

24         A.   Not that I know of.  I would -- I do during

25    the stop, but I don't believe it's at this time.

1          Q.   All right.   Let me know when you remember

2    that.

3          A.   Okay.

4          Q.   Okay, starting the video.

5                    (Video was played.)

6          Q.   14:04:39.   You have asked him for

7    registration and proof of insurance.   Did he give them to

8    you?

9          A.   Not at this time.

10         Q.   What is -- he's handed you something.   What

11   is it?

12         A.   I don't know.   I don't know yet.

13                   (Video was played.)

14         A.   That's me putting my pen back.   That's when I

15   start to recognize him.

16         Q.   All right.   14:04:49.   Becker tells you that

17   he had a DUI?

18         A.   He had a DUI.

19         Q.   And that makes you remember?

20         A.   Yes, and -- yes, it does.

21         Q.   All right.   Let me ask you a couple of

22   questions about that.

23         I have from Heber City, it's called the Law

24   Incident Table for DUI on December 2nd, 2004.   Is the Law

25   Incident Table another word for -- another name for a

1        A.   No.

2        Q.   So what did you do?

3        A.   I grabbed his hand tried to put it behind his

4   back.  And that's when he -- if I can remember, that's

5   how he did it.  And then I put his hand behind his back

6   and he pulled away from me, and that's when both me and

7   the other officer were able to grab each hand.

8        Q.   So the other officer was right there with

9   you?

10       A.   Yeah, he came to back me up.

11       Q.   And you were -- it says he was placed on the

12   hood.  Was that his car or your car?

13       A.   My car.

14       Q.   All right.  So, obviously, you were standing

15   near the front of your car?

16       A.   Yeah, we were -- we tried to do the field

17   sobriety test between cars.

18       Q.   Do you know if on this date, December 2nd,

19   2004, you would have had a dashboard video?

20       A.   I don't know.

21       Q.   All right.  And as you are remembering David

22   Becker now, are you remembering the circumstances of his

23   arrest?

24       A.   I can't say.  I just remember him.

25       Q.   Did that ever -- did the circumstances of the

1  arrest ever occur to you; in other words, his resisting

2  and what happened after that?

3      A.   Yeah, I called for 10-60, which usually when

4  we call 10-60 out oh a field sobriety test, another

5  officer is supposed to respond.

6      Q.   All right.  But my question was during this

7  confrontation on May 14th, 2005, did you -- did the

8  details of the December 2004 arrest come back to you?

9      A.   A little bit, and that's why I went 10-60.

10     Q.   All right.

11     A.   And you hear me go 10-60 in a minute.

12     Q.   Tell me when you do that.

13     A.   Okay.

14     Q.   Turn the video back on.

15              (Video was played.)

16     Q.   Stopping the video at 14:05:12.  There was

17  just a series of questions where you asked him if he had

18  anything to drink.  He said no?

19     A.   No.

20     Q.   And then you asked him several times how much

21  he's had to drink today.  He asked you why he is pulled

22  over, you say cracked windshield?

23     A.   Yes.

24     Q.   Is that an accurate depiction of basically

25  what is happening there?

```
1              A.   Yeah.

2              Q.   And now you have asked him to step out of the

3    car?

4              A.   Yes.

5              Q.   At 14:05:12.

6                        (Video was played.)

7              Q.   Stopping the video at 14:05:34.  You asked

8    Mr. Becker several times to step out.  Did he ever

9    refuse?

10             A.   No, he just never really responded is the

11   best way -- he never responded.

12             Q.   But now he has stepped out of the car?

13             A.   Yes, he has stepped out.

14             Q.   What was the time before that I gave you?

15             MS. PECK:   14:05:34 or 14:05 -- you went from

16   14:05:12 to 14:05:34.

17             Q.   (BY MR. RUSSELL)  All right.  So Would you

18   agree based on the time, that it took him 22 seconds to

19   get out of the car?

20             A.   Yeah, approximately.

21             Q.   And was he doing anything in the car during

22   that 22 seconds?

23             A.   Not that I remember.

24             Q.   Starting the video.

25                       (Video was played.)
```

1          Q.   Stopping at 14:06:07.  Is it obvious to you

2     at this point that Mr. Becker is impaired in some

3     fashion?

4          A.   Yes.

5          Q.   And it probably was even before this, wasn't

6     it?

7          A.   I noticed that the odor of alcohol and

8     repeated questions is a sign of intoxication.  Yes, he

9     was -- I started to realize that he may be unsafe to

10    drive a motor vehicle at this time.

11         Q.   What level of impairment based on your

12    experience and training do you think he is?

13         A.   At this point?

14         Q.   Mild?  Moderate?  Heavy?

15         A.   I can tell you he's unsafe to drive a motor

16    vehicle at this time.  That's all I can tell you.

17         Q.   All right.  Have you made that call yet?

18         A.   No.

19         Q.   Mr. Becker came out of the car with some

20    papers in his hand.  Do you know what they are?

21         A.   No, not at this time.

22         Q.   Is that what he was doing for the 22 seconds,

23    trying to find some papers?

24         A.   Not that I know of.

25         Q.   Did you ever learn what those papers were?

1          A.   To radio in stuff, to position my camera, to
2     do things like that.
3          Q.   So you wanted him to stand by the back of his
4     car and --
5          A.   By the back of his car.
6          Q.   -- not move?
7          A.   Yes.
8          Q.   Starting at 14:06:18.
9                    (Video was played.)
10         A.   This is the point I'm calling for another
11    unit.
12         Q.   All right.  Officer Bateman is saying that
13    he's calling for backup unit at 14:06:30?
14         A.   I called 10-60 and told them I'm out on FSTs.
15         Q.   Say that again.
16         A.   I call 10-60 and tell them I'm out on FSTs,
17    my location, and the plate number.
18         Q.   Starting the camera at 14:06:31.
19                   (Video was played.)
20         Q.   Stopping at 14:07:00.  You took the papers he
21    had in his hand away from him?
22         A.   Uh-huh.
23         Q.   One of them blew on the ground.  You grabbed
24    that paper and threw the papers into the front seat,
25    correct?

1          A.   Yes, and I believe his sunglasses.

2          Q.   And Mr. Becker pulled out a pair of

3    sunglasses?

4          A.   He had a pair of sunglasses in his hand.

5          Q.   And you took those?

6          A.   Yeah.

7          Q.   All right.  And at 14:07:00, you are now

8    asking him to touch your finger?

9          A.   Yes.

10         Q.   Is that a field sobriety test?

11         A.   Yes.

12         Q.   Starting the camera.

13                    (Video was played.)

14         Q.   14:07:15.  You asked him to touch your

15   finger.  He did, right?

16         A.   Yes.

17         Q.   You asked him if there was something wrong

18   with his eyes and he explained to you that he had one

19   contact in, one contact out?

20         A.   Yes.

21         Q.   He is communicating with you?

22         A.   Yes.

23         Q.   Answering your questions?

24         A.   Yeah, slowly, but yes.

25         Q.   You are deciding to try another field

1   47 seconds.   Officer Bateman, describe what has taken

2   place in that 47 seconds.

3          A.   He stated he doesn't want to go to prison.

4   He has stated that I have already done this to him

5   before.   Basically he is refusing to follow any of my

6   field sobriety instructions.

7          Q.   You wanted him to come to a point a few feet

8   away where you were?

9          A.   Uh-huh.

10         Q.   To commence the heel-toe?

11         A.   Yes.   We need space to do nine steps and a

12  three-point turn and nine steps back and there is no

13  space between our car.

14         Q.   And he didn't do it?

15         A.   No, he wouldn't come towards me.

16         Q.   And so you gave him an ultimatum?

17              MR. STIRBA:   I'm going to object to the

18  characterization ultimatum.   I don't think law

19  enforcement officers do that.   Describe what you did

20  then.

21              THE WITNESS:   I don't understand the

22  question.   I gave him an ultimatum?

23         Q.   (BY MR. RUSSELL)   What was going to happen to

24  him if he didn't do the field sobriety test?

25         A.   Go to jail.

```
 1              Q.  And now at 14:08:02, you have got your hands

 2   on him?

 3              A.  Yes.

 4              Q.  What are you -- what's your plan here at this

 5   point?  What are you going to do next?

 6              A.  Spin him around to where -- turn him around

 7   to where he's facing the vehicle, have him put his hands

 8   behind his back, you know, put him in handcuffs, pat him

 9   down, and go from there.

10              Q.  When you want -- so you want to cuff him?

11              A.  Basically, yes.

12              Q.  And when you want to cuff somebody, do you

13   say, "I'm going to -- you are under arrest, I'm going to

14   put you in handcuffs, put your hands behind your back"?

15              A.  Not always.

16              Q.  Usually?

17              A.  It depends on the subject.

18              Q.  All right.  We're looking at this subject.

19   Are you planning to do that or not?

20              A.  Am I planning on --

21              Q.  On asking him -- on telling him -- asking him

22   to put his hands behind his back so you can cuff him?

23              A.  At -- once I have a hold of his hand, yes, I

24   plan on it.

25              Q.  All right.  Starting at 14:08:02.
```

1                         (Video was played.)

2          A.   He is resisting.

3          Q.   Did you push him toward the car?

4          A.   He turned, stopped halfway, so I leaned him

5     against the car so I could get a hold of his hands to

6     where he can't move away from me.

7          Q.   Let's just go back two-tenths of a second.

8                         (Video was played.)

9          A.   I'm turning him around.

10         Q.   This is -- we are back at 14:08:02.  So watch

11    carefully and tell me what you do in this two-tenths of a

12    second.

13                        (Video was played.)

14         A.   That right there?

15         Q.   Yeah.

16         A.   I have his hand in mine attempting to do a

17    twist lock or an ACT move.

18         Q.   And you have moved him toward the car, right?

19         A.   Yes, so he can't spin away.

20         Q.   You have a hold of his hand?

21         A.   Yes.

22         Q.   At the beginning of a twist lock?

23         A.   Yes, attempting a twist lock.

24         Q.   14:08:04 starting.

25                        (Video was played.)

1        A.   He pulls away and he's got me stopped.

2        Q.   What happened in that three-tenths of a

3   second?  We are now at 14:08:07.

4        A.   He pulled his hand up and away.  My twist

5   lock was not working.

6        Q.   Do you still have a hold of his hand?

7        A.   Yes, but I am not strong enough.  He's able

8   to resist me twisting his hand.  You see my arm is

9   flexed, I'm trying to, but it's not working.

10        Q.   So what are you going to do next?

11        A.   I am -- at this point I'm going to try to

12   lean him up against the vehicle and keep him there till

13   backup arrives or depending on what else happens.

14        Q.   All right.  But first plan is to lean him up

15   to the vehicle and wait until backup arrives?

16        A.   Or see if that will -- by leaning him up

17   against the vehicle, that will subdue him enough that he

18   will stop resisting.

19        Q.   Did you ever ask him to put his hands behind

20   his back?

21        A.   I never got the chance.  He resisted.

22        Q.   Well, I don't want to argue with you, but you

23   grabbed his hands and started to twist lock before you

24   said anything to him?

25             MR. STIRBA:  Well, if the question is did he

1   do it, the video speaks for itself.  And I think he says

2   he didn't do it.

3           Q.   (BY MR. RUSSELL)  You didn't ask?

4           A.   I can't remember.

5           Q.   Do you feel threatened at this point?

6           A.   I feel that I am losing control.

7           Q.   Do you feel threatened?

8           A.   I feel that the subject is taking advantage

9   of the situation which is a threat.

10          Q.   To who?

11          A.   To me.

12          Q.   In what way?

13          A.   He's twice my size.  I have told him he's

14  under arrest.  He stated he doesn't want to go to prison.

15  That means, in my opinion, he is going to do what he can

16  to flee, possibly hop back in his vehicle.  He -- I felt

17  he was unsafe to drive.  We are in a busy parking lot.

18  He's fought with me once before.  I'm by myself.  I had

19  an officer last time fight that took us two to put him in

20  handcuffs.  I felt very outnumbered.

21          Q.   Where are the keys to the car?

22          A.   In it.

23          Q.   You thought he was capable of fleeing at this

24  point?

25          A.   I thought he was capable of overpowering me.

1          Q.   All right.   14:08:07.   And it's unfortunate

2     that the date is there, but watch what you do carefully,

3     please.

4                    (Video was played.)

5          Q.   What did you just do?

6          A.   I told him he was under arrest and he pulled

7     away even more and stabilized himself on the trunk.

8          Q.   Let's back that up.   That took five-tenths of

9     a second to 14:08:13.   You can watch it in slow motion as

10    it goes back, if you want to.

11                    (Video was played.)

12         Q.   All right.   Do you see where you are right

13    now?

14         A.   I'm behind him which is -- I'm behind him.

15    He's pulled away.   My hand was up there before, if you go

16    back a little bit further.   My hand comes off his and he

17    spins away from me which puts my hand up by his face.   He

18    pulls away, pulls my hand up towards -- towards him.

19    He's facing me which is a no-no.

20         Q.   14:08:09.

21         A.   Uh-huh.

22         Q.   What I want you to look at is whether he

23    pulls his hand out or you let go of his hand and

24    immediately start to do something else.   Okay?

25         A.   Okay.

```
 1                    (Video was played.)
 2         A.   I can't tell.
 3         Q.   All right.  We are talking hundredths of a
 4   second here?
 5         A.   Yes.
 6         Q.   You have moved Mr. Becker toward the rear of
 7   the car?
 8         A.   He's moving, I'm going with him.  It's kind
 9   of an equal resistance.
10         Q.   What's your next -- what are you going to do
11   next?
12         A.   At that point, I feel for me the best way to
13   take control so he doesn't flee or anything is take him
14   to the ground.
15         Q.   So it's now your intention to take him down?
16         A.   Yes.
17         Q.   And we are at 14:08:12.
18                    (Video was played.)
19         Q.   All right.  One hundredth of a second, you
20   have done what?
21         A.   My hand was never all the way from behind.
22   He always has my hand kind of pinned between his hand and
23   the belly most of the time.
24         So at that point, I almost bear hug him almost,
25   take him to the ground.  Hopefully that I can get --
```

```
 1    which is a stronger move -- his hand twisted in a lock

 2    and lock his arm.  So instead of just a wrist lock, it's

 3    an elbow lock and a -- kind of a shoulder lock.

 4          Q.   Mr. Becker has both his hands on the hood of

 5    the car?

 6          A.   Yes.

 7          Q.   On the back hood of the car?

 8          A.   Yes, resisting.

 9          Q.   Is he resisting or holding himself up?

10          A.   He's resisting.

11          Q.   How is he resisting?

12          A.   He's widened his stance, he's widened his

13    hands against the trunk, which is where you -- if he just

14    had his hands normal, it wouldn't be a resist.

15          Q.   What would be normal?

16          A.   In front of you just laying.  But he's

17    actually tightening up is the best way to put it.

18          Q.   Okay.  And we are talking a hundredth of a

19    second here?

20          A.   Yes.

21          Q.   Okay.  Starting at 14:08:13.

22                     (Video was played.)

23          Q.   What do you do there?

24          A.   I grab his shoulder and take him down.

25          Q.   Now --
```

1          A.   Ground stabilize him.

2          Q.   You have lifted his arms up into the air,

3     right?

4          A.   One.

5          Q.   Where is your other --

6          A.   It's around his side, I believe.

7          Q.   Okay.  So where is his left hand now at

8     14:08:14, one-tenth of a second later?

9          A.   I don't know.  I would believe it's still

10    down lower on the side.

11         Q.   And you are beginning to take him down?

12         A.   Yes.

13         Q.   Are you going to kick his legs out from under

14    him?

15         A.   No.

16         Q.   Did you?

17         A.   Not that I recall.  If I recall, it's almost

18    his weight overpowers me because he's twice my size and

19    it's like we fall to the ground.  He's too heavy for me

20    to even maneuver at all.

21         Q.   All right.  Look at the next couple of ticks

22    and see whether or not you apply any force to his going

23    to the ground.

24                    (Video was played.)

25         A.   No.  Actually I'm falling first.

1      A.   Well, when we hit the ground, you see me

2  immediately hop up to try to grab the wrist, get him in a

3  better twist lock, and that's when I realize he's knocked

4  out.

5      Q.   Let's see if we can see that.

6                  (Video was played.)

7      A.   Right there.  I already called for an

8  ambulance.

9      Q.   So you hit the ground and then what do you

10 do?

11     A.   You see me immediately hop -- kind of hop up

12 to get ready to grab a twist lock, and I notice he's not

13 coherent.  I call 10-4 10-52 which is an ambulance in ten

14 code.

15     Q.   When you called for backup did you get any

16 reply?

17     A.   No.

18     Q.   All right.  Oops.

19                  (Video was played.)

20     Q.   We'll go back to that.

21            THE VIDEOGRAPHER:  Do you want to go off the

22 record?

23            MR. RUSSELL:  How long was it, Bea, from the

24 time that Officer Bateman started the twist lock until

25 Mr. Becker was taken to the ground?

1          A.   We used to carry them, yes.

2          Q.   Did you have one in your trunk this day?

3          A.   I don't know.

4               MR. RUSSELL:   Why don't we take a short

5     break.

6               THE VIDEOGRAPHER:   Off the record.  10:39.

7               (A short recess was taken.)

8               THE VIDEOGRAPHER:   This is the beginning of

9     tape two.  We are back on the record.  The time is 10:51.

10         Q.   (BY MR. RUSSELL)   Officer Bateman --

11         A.   Yes.

12         Q.   -- we have now looked at the video from your

13    dashboard the day that David Becker was arrested.  And we

14    got through the point where you took him down to the

15    ground.  Correct?

16         A.   Ground stabilize him, yes.

17         Q.   Okay.  And that was at about 14:15 or about

18    eight seconds after the still that you can see on the

19    screen right now.  Right?

20         A.   Okay.

21         Q.   All right.  So describe the scene right now

22    at 14:07:58.

23         A.   The truck is pulling up.  He's got his arm

24    behind me, which is not good.

25         Q.   He's got his arm behind you?

1         A.   Behind him, sorry, behind his back.  A truck

2   is pulling up and he's standing, just standing there.

3         Q.   Why is his arm behind him not good?

4         A.   I haven't searched him.  You want -- one of

5   the biggest things in training is you always want to see

6   the hands.  Hands are what hurt you.

7         Q.   At this point, though, in your confrontation

8   is it fair to say that you knew Mr. Becker was drunk?

9              MR. STIRBA:  I'm going to object to the

10  characterization of confrontation.  But go ahead and

11  answer the question.

12             THE WITNESS:  I felt he was impaired, unsafe

13  to drove a motor vehicle.

14        Q.   (BY MR. RUSSELL)  And by this time, was it

15  apparent to you that he was not going to or was incapable

16  of doing the field sobriety tests?

17        A.   I felt he was going to not do anymore field

18  sobriety tests.

19        Q.   You had called for backup?

20        A.   I had called 10-60 which means another unit

21  needs to come.

22        Q.   And how long did you expect it would take

23  before they arrived?

24        A.   Minutes, less than two.

25        Q.   Right.  So quick?

1        A.   Okay, right there.

2        Q.   You told him to stand in a certain spot?

3        A.   And he didn't.

4        Q.   Did you give him a chance to do it?

5        A.   If you rewind it, I believe he said no.

6                    (Video was played.)

7        Q.   You took that as a no?

8        A.   Yeah, won't.

9        Q.   He wanted you to call his wife about taking

10  him to prison?

11        A.   No, he said he won't.   There's a word won't

12  in there.

13        Q.   Okay.

14                    (Video was played.)

15        Q.   Okay, you give him a choice there, "You are

16  under arrest now or do the test."   Do you give him a

17  chance to do the test?

18        A.   He still pulls away from me, which is he

19  didn't give me a verbal confirmation.   Pull away to me,

20  as in training, means no.   If they pull away from you,

21  that means they want to resist

22                    (Video was played.)

23        Q.   Do you consider that giving him a chance to

24  respond?

25        A.   Yes.   By pulling away he responded as no.

```
 1          A.  Stop resisting, follow my commands.

 2          Q.  And how long do you think it takes a drunk to

 3   process what's going on?  We know that he blew a .27

 4   afterwards.  You knew that, didn't you?

 5          A.  Blood draw, 2.7, yes.

 6          Q.  That's pretty drunk, isn't it?

 7          A.  Yeah.

 8          Q.  So how quickly do you expect a person in that

 9   condition to be able to respond to you?

10          MR. STIRBA:  Well, I'm going to object to the

11   extent it calls for speculation and conjecture about the

12   actual event and his knowledge in that area.  But if you

13   can answer it, go ahead.

14          THE WITNESS:  I have had people drunker

15   respond quicker.  It's undetermined.  I felt he should

16   have responded by then.

17          Q.  (BY MR. RUSSELL)  Let's go a little bit

18   further in Exhibit 1.  It's a report, two-page report,

19   from Deputy Wayne Winterton.

20          MR. STIRBA:  Which page, Counsel?

21          MR. RUSSELL:  I'm not sure.

22          THE WITNESS:  Ten.

23          Q.  (BY MR. RUSSELL)  Beginning with, "The

24   morning of January 28th."  Is that where you are?

25          MR. STIRBA:  No.
```

1          Q.   At 14:10:40 Becker is still unconscious?

2          A.   I don't know if he comes to at that point.

3    The EMT says no, he's just knocked out.  He was just --

4    he was just knocked out.  So I don't know if he came to.

5    I know he comes to before the ambulance.

6                    (Video was played.)

7          Q.   All right.  Did I just hear at 14:10:54,

8    "He's just knocked out?"

9          A.   Yeah, was or is.  I'm not sure what I said.

10         Q.   Do you want to hear it again?

11                   (Video was played.)

12         A.   That's me hopping in my car.  I got in my car

13   to get in for something.  I'm telling him he has a head

14   injury, don't move, da, da, da.  So he is awake by now.

15         Q.   At 14:11:55, approximately?

16         A.   Yeah.  That's when I start talking to him,

17   not knowing exactly what...

18                   (Video was played.)

19         A.   That's me getting into my car for something.

20         Q.   And you turned off the video?

21         A.   Yeah.

22         Q.   Because?

23         A.   At that point I was done dealing with him.

24         Q.   At this point, has the ambulance arrived yet?

25         A.   I heard another diesel.  I don't know if it