Steve Russell (2831)
Jeffrey D. Eisenberg (4029)
**EISENBERG & GILCHRIST**
215 South State Street, Suite 900
Salt Lake City, Utah 84111
Telephone: (801) 366-9100

Beatrice M. Peck
**TOMSIC & PECK**
136 East South Temple – Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-1995
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| MARY K. BECKER, individually, and as the guardian of DAVID H. BECKER,<br><br>     Plaintiff,<br><br>vs.<br><br>JASON BATEMAN, in an individual and official capacity, EDWARD L. RHOADES, in an official capacity, and HEBER CITY CORPORATION,<br><br>    Defendants. | **MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 2:07-cv-311<br><br>Judge Clark Waddoups<br>Magistrate Judge: Samuel Alba |

Plaintiffs, by and through counsel, hereby respectfully submits this Memorandum in Opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

Initially, Plaintiffs wholeheartedly agree that the dash-board video of the subject arrest provides an excellent source of factual information in this case. It speaks quite eloquently for itself,

yet it will remain the task of this Court and eventually the jury to decide for themselves what they see and what it means.

Many of Defendants' "facts" are not facts, but rather self-serving interpretations and legal conclusions, often on the critical issues that the trier of fact will have to determine. For example, "Becker evades the hold of Officer Bateman, and then quickly attempts to flee around the back rear corner of his vehicle . . ." (Def. Fact #58), and "Officer Bateman, in order to restrain Becker who is resisting arrest and fleeing from him . . ." (Def. Fact #60), are clearly distortions of what is plainly visible on the video. What Defendants have essentially attempted to do, is craft a set of facts to fit the case law regarding qualified immunity.

As Defendants' stress repeatedly in their brief, the critical issue is whether Officer Bateman's conduct *at the time it occurred* was reasonable under the circumstances then and there existing. In that regard, the video and other objective evidence must stand alone in making that determination. Post-hoc rationalizations and deposition testimony tailored to support an eventual assertion of qualified immunity are not particularly helpful. Having said that, Plaintiffs will not simply allow Defendants' perception of reality to stand unchallenged. Instead, Plaintiffs will counter with an alternative version of what is happening on the same video tape.

Finally, Plaintiffs agree with the Defendant, that the audio from the dash-cam video is not sharp, that quotations or transcripts from the video may contain unintentional errors, and that times noted may not be exact.

With that in mind:

-2-

## DISPUTED FACTS

1.  Plaintiffs admit Fact Nos. 1, 4, 5, 6, 8, 9, 11, 12, 13, 14 (Becker's actual response is: "No sir. Why did you pull me over?" (Video 14:04:53), 15-23 (Plaintiffs dispute that the quotes in this section are exactly accurate, but the gist of the discussion is correct), 26, 28, 34, 35, 36-38 (Plaintiffs dispute that the quotes in this section are exactly accurate, but the gist of the discussion is correct), 39, 40, 42, 43, 46, 47, 52, 62, 63-65, 67, 70, 71, 80, 87 and 88.

2.  Many of Defendants' "Facts" merely recite deposition testimony. In these instances, Plaintiffs' admit that the testimony was given, but, as with the examples given above, that does not make these statements true or factual. These include Fact Nos. 2, 7, 10, 24, 29, 51, 61, 68, 69, 72, 73, 74, 75 ,77, 82 and 83. To the extent these facts are presented for the truth of the matters involved, they are denied.

3.  The following defense facts are **denied**.

    a.  3.  After proceeding through a stop sign without stopping, Becker stops his vehicle. (Video 14:03:37)

    *Response:*  The implication is that Becker ran a stop sign. However, it is unclear from the video whether the stop sign applies to Becker, and indeed, Bateman never mentions the stop sign in his encounter with Becker.

    b.  25.  During this time, while waiting for Becker to exit the vehicle, Officer Bateman recalls that in the prior DUI stop with Becker, Bateman and another officer had to use some force to arrest Becker because Becker resisted, Officer Bateman accordingly determines he should call for backup in this situation. (Exh. A, p. 31, ln. 19 – p. 35, ln. 2;) (Exh. A, p. 34, ln. 25 – p. 35, ln. 5.)

    *Response:*  This sets forth an alleged thought process of Bateman which is impossible to verify. Becker denies that he resisted arrest in the previous stop in December, 2004. He had

a small dog with him that he was concerned would jump out of the car and be run over. He wanted to make sure the dog was safe before being arrested. (Mary Kay Becker depo at p. 71-72, see Exhibit A) There is also a video-tape of that arrest which Defendants have failed or refused to provide. (See, Def. Fact Nos. 43-44) Further, there is no indication on the video when and if Bateman called for back-up. From the testimony of other officers involved, it is unclear when, if ever, Bateman called for back-up. (See, Response to Def. Fact #32; and further discussion in Plaintiffs' Facts.)

c. 27. Officer Bateman questions Becker three more times about how much he has had to drink today, each time without any response to the questions. (Video 14:05:43 – 14:05:03[sic])

*Response:* Becker admits that he did not respond specifically to the repeated question, "How much have you had to drink today?" However, Becker did answer the question the first time it was asked. (See, Def. Fact No. 14) Thus, Bateman matched or exceeded Becker in the multiple repetition of the same question after he had an answer.

d. 30. The reality is that Becker was significantly impaired, and in fact had a blood alcohol content of .27, over three times the legal limit in Utah. (Jason Bateman depo at p. 73, ln. 3-7, see Exhibit B)

*Response:* Becker's blood alcohol levels were recorded several hours after the fact at Heber Valley Hospital and Utah Valley Hospital. His blood alcohol level at the time of the confrontation with Bateman is not known.

e. 31. When Becker finally moves, he moves past the area where Officer Bateman directed him to stand and moves toward Officer Bateman, who is now near the door of his patrol vehicle. (Video 14:06:12 – 14:06:16)

*Response:* The movement and location of Becker and Bateman during the time they are off-screen cannot be seen and is unknown. (See, Def. Fact #32)

-4-

f.    32.    For about twelve seconds you cannot see either Becker or Officer Bateman in the screen. Becker is pleading with Officer Bateman, wanting to know why he was pulled over. Officer Bateman calls for backup. (Video 14:06:22 – 14:06:340; Bateman Exh. B, p.39, ln. 10-25)

*Response:*    Here again, the alleged call for back-up is not clear on the video. The statement also contradicts Fact No. 25. (See also, response to Fact No. 25) Deputy Ryan Yardley checked the video at the scene to see if Bateman had called for back-up and determined he had not. (Ryan Yardley depo at p. 11-12, see Exhibit C) The officers responded to Bateman's call for an ambulance rather than call for back-up. (*Id.* at 7-8; Sgt. Mike Clegg depo at p. 6-7, see Exhibit D; Dan Bunnell depo at p. 13, see Exhibit E; See also, *Initial After Action Report,* dated May 16, 2005, attached as Exhibit F (ambulance was on scene before the responding officers))

g.    33.    Becker and Officer Bateman then reappear in the video, as Officer Bateman assists Becker with papers that he had in his hand, places these papers in the front seat of Becker's car, along with Becker's sunglasses. Becker still will not stand where Officer Bateman has directed him to stand. (Video 14:06:36 – 14:06:48); (Exh. A, p. 39, ln. 20 – p. 40, ln. 6.)

*Response:*    Becker admits this allegation except for the last sentence. Once Becker's paperwork was handled, Becker did stand where he was directed by Bateman.

h.    41.    Becker insinuates that Officer Bateman has followed him down here from his house. (Video 14:07:40)

*Response:*    The audio at this point is unintelligible. Plaintiffs deny that Becker is insinuating anything.

i.    44.    Officer Bateman states: "I know you've got a videotape of this," and moves toward Becker. Becker places his left arm behind his back so that Officer Bateman cannot take hold of it. (Video 14:07:49)

*Response:*    Plaintiff admits Bateman made the statement quoted, but denies that Becker put his hand behind his back "so Bateman cannot take hold of it." At this point Becker would have had no idea that Bateman was about to attempt to physically arrest him.

-5-

j.     45.     Officer Bateman testified that: "He's got his arm behind [him], which is not good . . . I haven't searched him. You want - - one of the biggest things in training is you always want to see the hands. Hands are what hurts you." (Bateman Exh. B, p.57, ln. 23 – p.58, ln. 6)

*Response:*     This is not a fact. It is merely Bateman's statement designed to justify the

unnecessary assault on Becker that he will initiate in the next few seconds. In fact, in his next

comment, Bateman is still trying to get Becker to perform field sobriety tests. (Def. Fact No. 46)

k.     48.     Officer Bateman moves toward Becker to place him under arrest. (Video 14:08:01)

*Response:*     Plaintiffs deny Bateman's post-hoc statement of his intent. Plaintiffs

allege Bateman's intent was to unnecessarily assault or subdue Becker.

l.     49.     Officer Bateman testified that at this point the proper way to arrest Becker was to: "Spin him around to where - - turn him around to where he's facing the vehicle, have him put his hands behind his back, you know, put him in handcuffs, pat him down, and go from there." (Exh. A, p. 43, ln. 6-9.)

*Response:*     Bateman's testimony notwithstanding, it is clear from the video that

Bateman in one continuous movement, pushed Becker around backward, shoved him to the rear

of the vehicle, applied a "half-nelson" type hold and took Becker violently to the ground.

Bateman never asked or demanded that Becker turn around, and never asked or demanded that

Becker put his hands behind his back. (Video 14:08:01 to end)

m.     50.     As Officer Bateman attempts to move Becker so that he is facing the vehicle, Becker resists arrest. (Bateman Exh. B, p.44, ln. 2-6; Video 14:08:01 – 14:08:04)

*Response:*     Becker clearly does not resist arrest. In fact, Becker states, "I'm not resisting

arrest." (Video 14:08:02)

n.     53.     Becker immediately cocks his right arm in a manner that does not allow Officer Batemen to place him in restraints , and verbally responds: "No." (Video 14:08:05)

-6-

*Response:*     Becker's response is a natural pain avoidance reaction to Bateman's sudden and unprovoked attack. Becker's statement of "No" is simply expressing his wish not to be hurt or assaulted. Again Becker specifically states, "I'm not resisting arrest." (Video 14:08:05 - 14:08:13)

o.     54.     During his deposition Officer Bateman testified that:
(Exh. A, p. 45, ln. 1 – p. 46, ln. 25.)

*Response:*     This is not a fact. It is merely Bateman's testimony designed to support a defense of qualified immunity. The video in this period of less than 10 seconds speaks for itself as to whether Becker "had Bateman stopped." (He most assuredly did not. Bateman proceeds without break through the takedown.); whether Bateman could have "leaned Becker against the vehicle and waited for back-up." (He could have); this also begs the question of whether the violence was necessary or justified in the first place; whether Bateman could have simply asked Becker to turn around and put his hands behind his back. (He could have, he never tried); whether Bateman was "threatened." (He was not); and whether Bateman was "outnumbered" or "overpowered." (He clearly was not) (Video 14:08:00 – 14:08:10)

p.     55.     Officer Bateman pauses, looks into Becker's eyes, and states: "You have two choices, be under arrest now, or do the tests. After Becker does not answer, Officer Bateman then again attempts to secure Becker. (Video 14:08:07)

*Response:*     Plaintiff denies that Bateman "looks into Becker's eyes." Bateman did make the statement quoted, but then gave Becker absolutely no opportunity to respond before attacking him. Moreover, this "Fact" completely contradicts prior Def. Fact Nos. 52-54. Someone with the mind set alleged in Def. Fact 54 would not have suddenly relented and given Becker "one last chance" to do field sobriety tests. Moreover, the statement is meaningless in the context of Bateman's unprovoked attack and continuous assault ending with the takedown.

Clearly, Becker had absolutely no chance to consider the option, much less respond to it. (Video 14:08:00 – 14:08:10)

        q.    56.    Officer Bateman testified that at this point: (Exh. A, p. 47, ln. 14-19.)

*Response:*    This is a total mischaracterization of what is clearly visible on the video. All of the force and momentum is being applied by Bateman on Becker. Here, Bateman says Becker facing him is a "no-no," where as previously Bateman demanded that Becker face him. (Def. Fact No. 35)

        r.    57.    Officer Bateman continued to testify: (Exh. A, p. 60, ln. 15-25.)

*Response:*    This is not a fact. It is merely Bateman's testimony designed to justify his unnecessary assault on Becker. The video in this period of less than 10 seconds speaks for itself. This is also a total mischaracterization of what is clearly visible on the video. All of the force and momentum is being applied by Bateman on Becker.

        s.    58.    Becker evades the hold of Officer Bateman, and then quickly attempts to flee around the back rear corner of his vehicle, placing his hands away from Officer Bateman on the rear of his vehicle. (Video 14:08:09 – 14:08:13)

*Response:*    This is a legal conclusion to justify Bateman's assault and the qualified immunity defense. From the video it is clear that Becker did not evade Bateman or attempt to flee.

        t.    59.    Officer Bateman testified as follows: (Exh. A, p. 48, ln. 6 – p. 49, ln. 17.)

*Response:*    See, generally responses to Def. Facts 50, 53-59. These facts represent the defense post-hoc characterizations to justify a qualified immunity defense. They are distortions of what is evident from the video. They also conveniently omit Becker's statement twice during the course of the assault, "I'm not resisting arrest." (Video 14:08:02 and 14:08:13)

u.    60.    Officer Bateman, in order to restrain Becker who is resisting arrest and fleeing from him, takes Becker in a bear hug, and takes him to the ground in a ground stabilization maneuver. (Video 14:08:14; Bateman Exh. B, p.49, ln. 23 – p.50, ln. 1)

*Response:*    This is a legal conclusion to justify Bateman's assault and qualified

immunity defense. From the video it is clear that Becker did not resist Bateman or attempt to

flee. Plaintiff admits that Batemen put Becker in a "bear-hug" (actually more like a Half-

Nelson) and took him to the ground. (Video 14:08:00 – 14:08:14)

v.    66.    The remainder of the video after Becker is placed on the ground in a ground control maneuver and the ambulance is called at 14:08:24, is irrelevant to Becker's claims, but is included on the video.

*Response:*    Plaintiffs deny that the remainder of the video is irrelevant. It contains

comments about Becker being unconscious and his condition, and shows the reaction of citizens

clearly upset by Bateman's conduct. (Video: 14:08:14 – End)

w.    76.    In this case, Sergeant Clegg, Sergeant Rose, and attorney Mark Smedley completed such an internal investigation, and determined that Officer Bateman followed Policies and Procedures. (*Id.* at p. 57, ln. 8-11;) (Exh. B p. 67, ln. 2-5.)

*Response:*    Plaintiffs admit that Clegg, Rose and Smedley "determined" that Bateman

followed policies and procedures. However, as set forth at length herein, their "investigation

was perfunctory, inadequate, designed purposefully to vindicate Bateman's conduct and included

the hiding and/or destruction of important evidence.

x.    78.    Chief Rhoades testified that: "Mr. Becker was resisting, the officer tried to get a twist lock or a wristlock on him, he resisted, he pulled his hand loose. Officer Bateman did an underhand around the arm and brought him to the ground. It's a technique that's taught in - - one of those techniques that - - to get a person physically under control. . . . I don't see where he used more force than was necessary to effect the arrest." (Exh. B p. 70, ln. 19-25 – p. 72, ln. 25.)

*Response:*    See responses to Def. Fact Nos. 50, 53-60. This is a legal conclusion and

statement of biased opinion, not a fact. Actually, Bateman himself testified that he was never taught the brutal technique used on Becker.

Q:    This takedown technique that you used on Mr. [Becker], does it have a name?

A:    No, not that I know of.

Q:    Where did you learn it?

A:    I don't know.

Q:    Did anybody ever teach you that?

A:    Not that I know of.          (Bateman Exh. B, p.61)

y.    79.    POST teaches this under-hand-around-the-arm ground control or ground stabilization technique. (*Id.* p.71, ln. 4-5)

*Response:*    See response to No. 78; (Chief Rhodes depo at p. 64, see Exhibit G)

z.    81.    Heber City Police hired Officer Bateman at a time when he was currently employed by Wasatch County. (Exh. B p. 22, ln. 20-23.)

*Response:*    The timing of Bateman's departure from Wasatch County is uncertain. Wasatch County has failed or refused to provide evidence of the timing and circumstances of Bateman's departure despite several proper GRAMA requests. (Letter dated May 6th from Wasatch County Personnel Director David Rowley; Response dated May 15th, see Exhibit H)

aa.    84.    "The background check officers - - a detective will follow up on references and contacts that we can make contact with to see what the person's like[.]" (Exh. B p. 13, ln. 13-15.)

*Response:*    Plaintiffs admit that a back-ground check on Bateman was done. However, it was shockingly inadequate. Heber City personnel did not request, nor bother to go several blocks down Main Street to look at Bateman's record, or speak to any of the several Wasatch County officers who had disciplined Bateman of found him unfit for service. (See, extended discussion in Part II(A) of Brief)

-10-

bb.   85.   The background check also includes checking into prior employment. (*Id.* at p. 14, ln. 7-9.)

*Response:*   See response to No. 84.

cc.   86.   A background check was conducted on Officer Bateman prior to his being hired by Heber City Police. (Exh. B p. 19, ln 22 – p. 20, ln. 3 (Deputy Sheriff with Wasatch County indicated "Jason Bateman was a good worker, a good officer and would rehire him if he had the opportunity.").)

*Response:*   See response to Def. Fact Nos. 84-85

dd.   89.   Chief Rhodes had no concerns about hiring Officer Bateman. (Rhodes Exh. G, p.15, ln.16-18) "He was the best applicant for the job. He applied to us. We didn't search him out. He was the top ticket writer in the county and top DUI enforcement officer in the county. We got a golden ace." (Rhodes Exh G, p.23, ln. 5-9)

*Response:*   Plaintiffs admit everything in this fact except that Heber City got a

"golden ace" when they hired Bateman. What Heber City got was an officer who amassed a

terrible record in Wasatch County including insubordination, a dangerous and violent approach

to his duties, suicidal ideation, lack of compassion or empathy toward citizens, repeated stints on

probation or other discipline, and at least two findings by superiors that he was "unfit for duty as

a police officer."

This conduct would continue, at least until May 14, 2005, when Bateman intentionally

and seriously injured David Becker. Bateman, in fact had previously provided a virtual

transcript of how he would handle Becker to his supervisors at Wasatch County.

What Heber City got when it hired Jason Bateman was a revenue producer. Perhaps that

is what qualifies as a "golden ace" in Heber City.

This response is supported by Plaintiffs' Facts and Argument set forth below.

## STATEMENT OF ADDITIONAL FACTS

Many of the following facts are based on an objective view of the subject video tape. Since many the facts point out things that were *not done*, the exact time or frame in the video cannot be made.

1.    Very soon in the confrontation captured on video tape, before any attempt at field sobriety tests, Bateman determined that Becker was intoxicated and unable to safely drive a vehicle, and would have to be arrested. (Def. Fact #29)

2.    It should have been objectively obvious to any person, especially a trained officer with a specialty in DUI arrests that David Becker would not, or could not complete field sobriety tests. (See generally, Video)

Q:    . . . It becomes pretty clear that Becker is not going to do the field sobriety test, doesn't it? That's fair, isn't it?

A:    I think that's a fair statement.

(Ken Wallentine depo at p. 64, see Exhibit I)

3.    A suspect is not even required to consent to a request to perform field sobriety tests.

Q:    Now, if a person is pulled over for a DUI and the officer says, you know, "I want you to come out of the car, I want you to do these tests," a person can just say no, can't they?

A:    They can.

Q:    They'll be arrested, but you don't have to cooperate with field sobriety tests if you don't want to, right?

A:    Sure.         (*Id.*)

4.    At no time did Bateman inform Becker that he intended to arrest him, or explain that Becker was subject to arrest for failing or refusing to perform the field sobriety tests. (See generally, Video)  In fact, Bateman states, "Who knows if you are going under arrest?" (Def. Fact #39)

-12-

5.      At no time until Bateman has initiated his physical assault does he inform Becker that he is under arrest.  (See generally, Video)

6.      During the course of the physical confrontation, Bateman tells Becker, "You have two choices, be under arrest now or do the tests."  (Def. Fact #55 [transcript may not be completely accurate])  However, Bateman gives Becker no opportunity to respond before continuing with the violent take-down.  (Video 14:08:00 – 14:08:13)

7.      Bateman knows from training and experience the proper way to effect an arrest in these circumstances, i.e., to have the person turn around and put his hands behind his back, in other words, voluntarily submit, then "put him in handcuffs, pat him down, and go from there."  (Def. Fact #49)

8.      At no time does Bateman simply ask Becker to turn around.  (See generally, Video)

9.      At no time does Bateman simply ask Becker to put his hands behind his back.  (*Id.*)

Detective Ryan Yardley testified as follows:

A:      There's always some little bit of force if somebody doesn't want to get hand-cuffed. Usually, "Stop, knock it off so we don't have to hurt you or hurt us." Usually, it's "Put you hands behind your back." Very seldom do we get into a scuffle.

Q:      And that would be the logical first step all the time, right?

A:      Absolutely, to let them know that, "Hey, for your safety and mine, let's not do this." (Yardley Exh. C, p. 22-23)

Sergeant Mike Clegg testified:

*As soon as you place someone under arrest and you've asked them to put their hands behind their back and they don't,* for their safety and your safety, you have to take the situation under control.  (Clegg Exh. D, p. 46, emphasis added)

10.     At no time prior to Bateman initiating the physical confrontation, does Becker give any indication that he will resist arrest.  (See generally, Video)

-13-

11.     Becker posed no physical threat to Officer Bateman. (Video; Wallentine Exh. I, p. 69)

12.     Even after Bateman has initiated his physical assault on Becker, Becker states twice, "I am not resisting arrest." (Video ~ 14:08:02 and 14:08:13)

13.     Defendants claim that Becker was not injured in the confrontation with Bateman, but rather had suffered an injury sufficient to cause massive brain damage prior to the Bateman incident. (See, statement of counsel during deposition of Jeff Winterton depo at p. 21-22, see Exhibit J) Yet at no time does Bateman ask Becker if there is something wrong with him, or indicate any concern for his health or welfare. (See generally, Video)

### Bateman's History as a Wasatch County Sheriff

14.     Bateman hired on as a Deputy with Wasatch County on or about May 26, 1999.

15.     In November, 1999, Bateman was written up by his Sergeant Jeff Winterton after an incident when Bateman was insubordinate to a superior in the department. (See, Winterton Report attached as Exhibit K)

16.     The report includes the following:

a.     I asked Deputy Bateman if he was happy with his job. Deputy Bateman said that he was not happy with his job and hated it . . . I asked Deputy Bateman why he was not happy with his job. Deputy Bateman said that there was not enough action. He said that he likes to fight and for the past while all he wants to do is "Walk the Line." I asked Deputy Bateman what he meant by that statement. Deputy Bateman told me that he gets a thrill when there is a chance that a fight will start and he can be involved.

b.     I told deputy Bateman that I was very concerned about his behavior. Deputy Bateman said that is the way he is and he likes confrontations. Deputy Bateman said that when he went to the academy (POST) they taught him that if you tell someone they are going to jail and they tell you no, then you throw them to the ground and take them to jail.

c.     After talking with Deputy Bateman I am very concerned with his behavior and his attitude towards his duties and some of the deputies in the department, and towards the office

-14-

as a whole. I feel that Deputy Batemen is a great liability to the department and to other deputies in the department. It is my recommendation . . . as Deputy Bateman's sergeant that he be immediately relieved of his duties as a deputy sheriff for Wasatch County.

17.     With regard to paragraph 16(c), Bateman's professed method for dealing with subjects is not taught at POST or in police officer training for Heber City. (Rhodes Exh. G, at p. 29; Winterton Exh. J, at p. 23)

18.     Chief Rhodes has been Chief of Police for Heber City since approximately 1998. (Rhodes Exh. G, at p. 8) He has never hired an officer with a report from another department similar to that described above. (*Id.* at 30)

19.     On January 27, 2001, there was an ATV fatality to which Bateman responded after being specifically ordered not to. (See, Report of Deputy Brian Rowser, attached as Exhibit L; See Winterton Report, Exh. K). Included in those reports is the following information about Bateman:

a.      That he was suicidal and spent time on patrol looking for a tree near Strawberry Reservoir from which to hang himself.

b.      That when he gets "upset" on duty he turns off his police radio, which, according to Lt. Jeff Winterton is "pretty stupid . . . That's your lifeline. That's your means of communication." (Winterton Exh. J, at p. 49-50)

c.      That he wanted to work alone and not work with other officers, and that he didn't want fellow officers anywhere near him.

d.      That he intentionally disobeyed his commanding officer.

e.      That he believed police should be completely emotionless when dealing with the public and act like "Robo-Cops."

f.      That he won't perform a DUI stop when other officers are around and that he doesn't want other officers watch him take a suspect through field sobriety tests.

20. After preparing his report, Deputy Winterton called Bateman's Sergeant Todd Bonner at home to inform him that he did not believe Bateman was fit for duty. (Winterton Report, Exh. K)

21. On December 31, 2001, another report was prepared on Bateman concerning dereliction of duty and disturbing personal conduct during October and November, 2001. (Report of Lt. John Rogers, attached as Exhibit M)

22. That document refers to "several reports from concerned individuals of disturbing behavior of Deputy Jason Bateman." These included continuing suicidal ideation and personal grooming habits that were "quite poor." (*Id.*)

23. The "Plan of Action" of Wasatch County as of December 31, 2001 was to terminate Bateman if there are any further problems. (*Id.*)

24. At some point "near the end" of his employment with Wasatch County, Bateman had his fire-arm taken away from him, and was given "time off" due to mental instability, depression and suicide concerns. (Winterton Exh. J, at p. 17-18, 44)

25. On September 7, 2002, Bateman was again written up by his Sergeant Todd Bonner for "obscene and abusive conduct" toward female co-workers (dispatchers). (See Exhibit N)

26. The Disciplinary Action Report dated September 7, 2002, placed Bateman on 6 months probation and required him to complete an anger management course. (*Id.*)

27. That Disciplinary Action Report is the last document in Bateman's Wasatch County file received by Plaintiffs pursuant to proper GRAMA request. Despite repeated requests for the complete file, Wasatch County has failed and refused to provide any further documentation. (See, Letter dated May 6, 2009 from Wasatch County to Plaintiffs' counsel, and counsel's response dated

May 15, 2009, attached as Exhibit H)  For example the Wasatch County file does not include any documentation of Sarah Larson's harassment complaint against Bateman. (See, Plaintiff's fact #44(e).

28.     At the time Bateman was hired by Heber City in October, 2004, Chief Rhodes claims to have had no information about any of the foregoing conduct.  (Rhodes Exh. G, at p. 50-51)

29.     Sergeant Mike Clegg testified:

Q:     What's - - is there a protocol or policy for background checks on new hires?

A:     ... *[W]e try to find out everything we can about the person.*  We do everything that's on their application.  Check into their prior work, you know, talk to their references.  That's our protocol. (Clegg Exh. D, at p. 69, emphasis added)

Q:     Okay.  So you have got - - he's coming from Wasatch County, they're 10 blocks down the road . . . Does anyone go there and - - Chief Spanos, VanWagoner, whoever it was at the time, and his superiors and say, What about Jason Bateman?

A:     I have no idea. I would imagine whoever done the background check would have, but I don't know.  I didn't do it. So I wasn't privy to that information.

Q:     Did you ever hear from anybody that he had a history of mental illness before he hired on?

A:     No.

Q:     Insubordination?

A:     Nope.

Q:     Suicide?

A:     Nope.

Q:     Aggressive behavior?

A:     Nope.

Q:     Likes to fight?

-17-

A:      Nope.

Q:      Likes to throw people to the ground?

A:      Nope.

Q:      Would it surprise you if all that stuff was in his personnel file from Wasatch County?

A:      Yeah.        (Clegg Exh. D, at p. 69-71)

30.     Deputy Dan Bunnell recommended that Heber City hire Bateman. He would not have made the recommendation if he had known about the conduct described above. (Bunnell Exh. E, at p. 23-24)

31.     Bateman's conduct as an officer with Wasatch County should have been investigated by Heber City. (Rhodes Exh. G, at p. 14)

32.     No one at Heber City ever looked at, or talked to anyone about, Bateman's personnel file from Wasatch County. (Rhodes Exh. G, at p. 15)

### Heber City's Review of the Bateman, Becker Incident

33.     Immediately after Becker was severely injured by Bateman an Internal Investigation Team was assembled to investigate the incident. The four were Sergeant Perry Rose, Sergeant Mike Clegg, Sergeant Jason Bradley and Heber City Attorney Mark Smedley. (*Initial After Action Report*, dated May 16, 2005, attached as Exhibit F)

34.     The investigation team watched the Bateman's dash-cam video. (Clegg Exh. D, at p. 14-15)

35.     An audio tape was allegedly made by Jeff Winterton of a witness (who refused to identify himself) saying the officer had "done nothing wrong." (Clegg Exh. D, at p. 21-24; See also,

*Initial After Action Report*, page 3, attached as Exhibit F) No such tape exists in the investigation file, nor has it been produced.

36. It is "routine" for Heber City officers to carry a recording device for witness statements and interviews. (Bunnell Exh E, at p. 26)

37. Any recorded statements taken in the course of an incident investigation must be placed in evidence in the incident file. (Clegg Exh. D, at p. 64-65, 67)

38. Any action any of the investigation team took with regard to the incident should be recorded in the incident file. (Clegg Exh. D, at p. 56-60)

39. None of the citizens who witnessed the Becker – Bateman incident, those plainly visible on the video and others who were there, were interviewed or attempted to be located. (Perry Rose depo at p. 20, Exhibit O)

40. It is alleged that Sgt. Rose interviewed Mary Kay Becker (David's wife) shortly after the incident. (Clegg Exh. D, at p. 71; Rose Exh. O, at p. 9-13) There is nothing in the investigative file about the interview – no notes, no report, no recording. Rose testified, "It was nothing that we felt was significant." (Rose Exh. O, at p. 9-11) Mark Kay Becker denies that she made any of the statements attributed to her.

41. Sgt. Clegg knew Sgt. Rose had gone out to talk to Becker's neighbors (Sarah Larson, Jaxon Allred, Joan and Todd Ivie). There is nothing in the investigation file or the reports regarding these interviews. (Clegg Exh. D, at p. 62-64)

42. Rose confirms that he spoke with the Beckers' neighbors as part of the investigation (Rose Exh. O, at p. 9, 15), but denies that the interviews were tape recorded. (*Id.* at 14)

43. With regard to the interviews of neighbors, Rose testified:

Basically there was nothing significant that came out of that that I'm ware of. I would have documented it . . . I don't find any documentation of that other than remembrance of that conversation was, yeah, he (Becker) was out cutting some trees and trimming trees up in the yard and stuff like that. Trees were falling on his head and different things like that. And then there was also a conversation about Mr. Becker's alcoholism, that he was drunk continuously. (Exh. D, at p. 8)

44.     Rose confirms that he made no reports of his interviews. (Rose Exh. O, at p. 17)

45.     With regard to being interviewed by Sgt. Perry Rose, Sarah Larsen and Jason Allred

testified as follows:

a.     The interview took place the morning after Becker was injured by Bateman. (Sunday, May 15, 2005) (Jason Allred depo at p. 9, Exhibit P)

b.     Rose had a tape recorder, asked for permission to record the conversation, and did record it. (Sarah Larsen depo at p. 53, Exhibit Q; Allred Exh. P, at p. 22-23)

c.     Rose asked "serious" questions about Bateman's character and Becker's character. (Larsen Exh. Q, at p. 53-54)          The interview lasted 45 minutes to an hour. (*Id.* at 56)

d.     Rose asked whether they were aware of any injuries Becker had suffered prior to his altercation with Bateman. (Larsen Exh. Q, at p. 53-54; Allred Exh. P, at p. 27, 30)

e.     Rose asked about a harassment complaint Larsen had previously filed against Bateman, and was therefore aware of it prior to the interview. (*Id.* at 57-58)

f.     For approximately 5 years, Becker visited Larsen and Allred virtually daily, sometimes several times a day, both day and night. During the entire period, the only thing they saw Dave drink was beer, they did not consider him to be an alcoholic, and they only saw him intoxicated a few times. (Larsen Exh. Q, at p. 55, 64; Allred Exh. P, at p. 6-7, 48-49)

46.     Larsen subsequently went to Heber City to request a copy of the recorded

conversation. She was informed that the recording is gone. "They don't have any record of it being

filed." (Larsen Exh. Q, at p. 56)

47.     Following Becker's injury and the Perry Rose interviews the next morning, Bateman

and other officers began patrolling the street where the Beckers, Allred-Larsen and the Ivies lived

several times a day. (Laresen Exh. Q, at p. 52; Allred Exh. P, at p. 50-51) Larsen felt that Bateman

was "stalking the area." (Larsen Exh. Q, at p. 63)

48.     After being interviewed by Perry Rose and having there home and street "stalked" by Bateman and other officers, Sarah Larsen and Jason Allred were so concerned about retaliation or harassment by the police that they moved out of Heber. (Larsen Exh. Q, at p. 6; Allred Exh. P, at p. 9 ["We moved to Cedar City to move away from it because we're scared of (Bateman)"], 50-51.

49.     Jason Allred believes the Heber City Police later tried to set him up for a drug bust, which further motivated he and Larsen to move away from Heber. (Allred Exh. P, at p. 53-55)

50.     None of the officers and supervisors who were asked can remember a single incident where a Heber City officer has been disciplined for use of excessive force. (Clegg Exh. D, at p. 49-50 [14 years]); Bunnell Exh. E, at p. 38 [6½ years]); Yardley Exh. C, at p. 29 [6 years]);

## ARGUMENT

## I.    DEFENDANT BATEMAN IS NOT ENTITLED TO QUALIFIED IMMUNITY

The question before the Court is simple. Did Officer Bateman use unnecessary and/or excessive force in his attempt to arrest David Becker?

Plaintiff acknowledges that she has the burden to prove that Bateman's actions violated a constitutional or statutory right of Becker, *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001), and thereafter to demonstrate that the right at issue was clearly established at the time of Bateman's conduct. (*Id.* at 1156).

The Court must make its determination not on what the Defendants claim about their conduct and motivation, nor, for that matter what the plaintiff claims. The test is *objective reasonableness*. Force becomes constitutionally excessive if it is objectively unreasonable in light of the facts and circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

## A.    Bateman Violated Becker's Fourth Amendment Right

The Fourth Amendment to the United States Constitution provides that a governmental seizure of an individual must be reasonable.  The Fourth Amendment includes citizens' protection against the use of excessive force by the police.  Claims of excessive force are analyzed under the objective reasonableness standard, which requires inquiry into the factual circumstances of the case. *Graham v. Connor*, 490 U.S. 386 (1989).  Relevant factor include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspects attempts to resist or evade arrest. *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001).

In this case, we have objective evidence from the video of exactly what happened. Defendants' attempts to characterize the incident so as to "fit" a qualified immunity defense notwithstanding, Bateman clearly used unconstitutionally excessive force on Becker.  Nothing in the circumstances justifies a take-down so violent as to result in severe, permanent brain damage to Becker.

First, the crime is not severe.  It is a DUI, mid-afternoon, in broad daylight in a public parking lot.  Second, Becker clearly poses no threat to Bateman or other people.  Bateman has Becker out of his car, and Becker, who makes no attempt to get back in the car or otherwise "get away," is rather clearly incapable of even trying.  (Defendants attempt to persuade the Court that Becker, who could not even manage an attempt at heel-to-toe walking, was suddenly going to flee.) All Bateman needed to do to safely handle the situation was to continue in the futile attempts to get Becker to perform the field sobriety tests until back-up assistance arrived.

Defendants' main thrust appears to be their attempt to convince this Court that Becker was "resisting arrest" and "attempting to flee."  Here again, Defendants' position is not supported by an

honestly objective examination of the video. Bateman is clearly and unnecessarily agitated and aggressive with Becker from the start. Bateman indicates his intent very early in the confrontation to escalate the situation with his repeated unnecessary ultimatums and threats. *For the last time, how many drinks have you had today?* (Video 14:05:01) *For the last time, step on out (of the car)* (Video 14:05:31) *For the last time, do you want to do the eye test?* (Video 14:07:20) *Sir, you've got one last chance . . .* (Video 14:07:57) This last threat immediately precedes Bateman's decision to use unnecessary and violent force. (Video 14:08:02)

All of the movements of Becker characterized by Bateman as resistance or attempting to flee are the simple bi-product of Bateman's sudden use of unnecessary force. Clearly, Bateman spins Becker around and then shoves him to the back of the vehicle where it is necessary for Becker to try to maintain balance for his own protection. More importantly, Becker is never given a chance to voluntarily comply with Bateman's demands. One second (Video 14:08:01), Bateman is telling Becker to "stand right here" for the heel-to-toe, and the very next second (14:08:02), without giving Becker any opportunity to comply, Bateman is applying a painful wrist lock and pushing Becker around. Bateman never asks/demands that Becker voluntarily turn around and put his hands behind his back to facilitate the arrest.

Defendants place great emphasis on Becker's utterance of the word "No" when Bateman attacks him. Plaintiffs readily concede that it was Becker's preference not to be arrested that day, and Becker would undoubtedly have been content to stand there and try to talk Bateman out of it for the few minutes it would have taken for Bateman's back-up to arrive. Becker had been begging Bateman not to arrest him throughout the confrontation. Thus the word "No" in that context was not a refusal to submit, but rather a continuation of his plea not to be arrested. (The Court should

listen to it carefully.) It had already happened just moments before.

> Bateman: Have you had anything to drink today?
>
> Becker: No sir. Why are you pulling me over?
>
> Bateman: Cracked windshield. For the last time, how many drinks have you had today?
>
> Becker: Nooo. (Video 14:04:52 – 14:05:01)

Plaintiffs assert that an unnecessary take down violent enough to cause severe, permanent brain damage under these circumstances clearly constitutes constitutionally prohibited excessive force. Nevertheless, surely reasonable minds could differ as to the reasonableness of the nature and extent of the force used in this instance. For that reason, it is a matter that must be decided by the trier of fact and summary judgment in Defendants' favor is inappropriate. See, *Pierce v. City of Salem*, 2008 WL 4415407 *11 (D. Or. 9/19/08), "Given that the balancing usually involves disputed factual contentions, summary judgment in excessive force cases 'should be granted sparingly,' " citing, *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).

## B. Bateman's Conduct Violated Clearly Established Law

Having established that Bateman's conduct violated Becker's constitutional right to be free from excessive force, Plaintiffs must thereafter demonstrate that the right at issue was clearly established at the time of Bateman's conduct. In satisfying this prong of the qualified immunity test, it is not necessary that Plaintiffs show that the exact conduct in question has been ruled unconstitutional. Rather, the relevant inquiry is whether the legal standards applicable to Becker's right to be free from excessive force were clearly established. *Jackson v. Steinhour*, 2005 WL 2293634 *5 (D.Colo. 2000)("Defendants' argument that Plaintiffs cannot provide legal authority for the proposition that a standard police arm-bar take down can amount to excessive force is misplaced.") The Tenth Circuit had held that there is no question but that the legal standards regarding excessive force was established at the time of the incident here. *Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001)("the reasonableness standard is "clearly established" in the context of §1983 actions for excessive force.")

Contrary to Defendants' position, the Tenth Circuit has not established any standards or definitely stated how much force may be used with potentially intoxicated persons. Rather, to prove a Defendant violated clearly established constitutional law, it is sufficient that Plaintiffs show that a reasonable officer would have had "fair warning" from a Supreme Court or Tenth Circuit decision that taking-down Plaintiffs constituted excessive force. Here, a reasonable officer had "fair warning" because Tenth Circuit law established at the time of Baterman's actions that a reasonable officer could not believe a take down maneuver to be lawful when used on a person who "did not pose a threat and/or was not actively resisting arrest and attempting to escape." *Hays v. Ellis,* 331 F.Supp.2d

1303, 1309 (D. Colo. 2004) (citing *Graham v. Conner,* 490 U.S. 386, 396 (1989). See also, *Jackson v. Steinhour, supra.*

One of the most frightening things about this case is that Jason Bateman, as a Deputy with Wasatch County, provided a virtual transcript of what he would do to Becker on May 14, 2005, and was specifically told by his superior, that, *No, that's **not** the way you do it.* From the report of November 6, 1999 by Bateman's Sergeant Jeff Winterton:

> I told deputy Bateman that I was very concerned about his behavior. Deputy Bateman said that is the way he is and he likes confrontations. Deputy Bateman said that when he went to the academy (POST) they taught him that if you tell someone they are going to jail and they tell you no, then you throw them to the ground and take them to jail.
>
> *I told Deputy Bateman that is not the way it is.* I told him that he can only use the amount of force necessary to safely take the suspect into custody. I told Deputy Bateman that one of the best tools that he can develop is his mouth. Deputy Bateman just shrugged as his response. Deputy Bateman started to tell me that his friends that are in law enforcement in other jurisdictions are always busy and are always slamming people to the ground . . . *I told Deputy Bateman that was not [the way] that this department operated.* (Exhibit R, emphasis added)

In addition to being specifically told that the conduct he would later subject David Becker to was improper and inappropriate, this incident early in Bateman's career also resulted in punishment in the form of continued probation, as well as a recommendation that he be immediately terminated. (*Id.*) Bateman clearly had "fair warning" that this type of conduct was unconstitutional.

Aside from this very specific, direct and personal knowledge that throwing people to the ground is *not the way you do it,* it is enough that an officer understand in general that his conduct exceeds what is constitutionally acceptable. In this regard, it is clearly established that it is constitutionally unreasonable to use force where there is no need for force, to continue to use force

after the need for force has dissipated, or to gratuitously inflict pain. *Pierce v. City of Salem, supra.* at *13; *cite*

Bateman did all three. First, there was no reason to use force on Becker at all. Second, after the initial application of force and Bateman having shoved Becker to the back of his car, Bateman clearly has full control of the situation, and no further force is necessary. Finally, rather than just arrest Becker with minimal force, Bateman violently slams Becker to the pavement, with no chance to protect his head. Bateman admitted that was contrary to his training.

Q:     How about protecting the head?

A:     You try to.

Q:     How do you do that?

A:     Basically you don't throw them down to where their head's first. (Bateman Exh. B, at p. 27)

The resulting impact knocked Becker unconscious for several minutes and resulted in severe, permanent brain damage – a gratuitous infliction of pain, suffering, and permanent disability. (Video 14:08-00 – 14:08:13)

Naturally, Defendants interpret what can clearly be seen on the video differently that the Plaintiffs. Given the factual disputes, Defendants cannot prove for the purpose of qualified immunity that a reasonable officer could have believed that he did not violate Becker's constitutional rights.

## II.     DEFENDANTS RHODES AND HEBER CITY ARE NOT ENTITLED TO QUALIFIED IMMUNITY

To the extent Bateman's position on qualified immunity fails, so also must that of Defendant Chief Rhodes, Bateman's commanding officer. Rhodes concedes that he is personally responsible for the conduct of his officers. (Rhodes Exh. G, at p. 9)

Moreover, both Rhodes and Heber City are liable in this case, and not entitled to qualified immunity, both due to negligent hiring and supervision of Bateman, and their conduct following Bateman's injury in hiding or destroying important evidence and thereby clearly indicating their knowledge that Bateman has used illegal and excessive force.

## A.    Negligent Hiring and Supervision

While a Deputy with Wasatch County for over 5 years, Bateman proved himself to be insubordinant, defiant, suicidal, physically aggressive, a danger to himself, his fellow officers and the public, possibly sociopathic, and at least twice, unfit for duty.

Rather incredibly, Chief Rhodes claims to have known nothing about Bateman prior to hiring him even though the Wasatch County Sheriff and Heber City Police are both located in Heber, share a common jurisdiction, share dispatch services and jail facilities, and back-up each others' calls on a routine basis. Despite Rhodes' testimony to the contrary, a reasonable Judge or jury would be fully entitled to disregard Rhodes' testimony that Bateman was an unknown when he was hired. Indeed, [Bateman] would have been a known entity to Heber City after five years with the Wasatch County Sheriff. (Deputy Brian Rowser depo at p. 49-50, Exhibit R) Despite his alleged lack of knowledge about Bateman, Chief Rhodes nevertheless considered that Heber City acquired in Bateman a "golden ace." Why? Bateman had "led the league" in traffic stops, tickets, citations and arrests.

For a position that provided Bateman with virtually unlimited power over the rights and freedom of its citizens, and authorized use of force up to and including deadly force against the public, the Heber City hiring practices are little more than a joke. The entire "Background Investigation" on Bateman consists of a single page. (See attached Exhibit S) If the testimony of Chief Rhodes and others is to be believed, no one even bothered to inquire about Bateman's work history, let alone request information from his personnel file. As references, Bateman listed Kelly Christensen, a "County Worker" and Wasatch County Deputies Rick Benson and Todd Bonner. Of the three, investigator Jeremy Nelson spoke only to Bonner.

> Deputy Bonner told me that [Bateman] is a good hard worker, and he would not hesitate to hire Jason. Todd told me that he is a go getter, and if he is given an assignment Jason is the person that will "go all out" to get it done. Deputy Bonner told me that sometimes Jason is pouty and moody, but is otherwise a good worker and good employee.

Let's review at this point what Bonner, who was actually one of Bateman's sergeants and knew about Bateman.

1. Bonner was Bateman's sergeant when he was disciplined in February, 2001 for insubordination among other things. The discipline included a written reprimand, 5-day suspension without pay, and six months probation, during which, "no violation by him of any kind will be tolerated." (See, Exhibit N)

2. Concerning the same incident, Bonner was called at home by Deputy Wayne Winterton who was involved in the incident. Winterton told Bonner that Bateman was unfit for duty. (See, Exhibit N)

3. Brian Rowser's report on the incident states:

> Wayne (Winterton) reminded [Bateman] that he had given him a direct order as the [Officer in Charge] not to respond to that call. [Bateman] said he did not care,

-29-

he was going no matter what. [Winterton] asked, "What if *Sgt. Bonner* or Lt. Rogers had ordered you not to go." [Bateman] again said it did not matter who it was, he was going. (Exhibit L)

Bonner would have been aware of all the reports concerning Bateman from Deputies Rick Benson, Wayne Winterton, Steve Meacham, and Brian Rowser, since Bonner was tasked by Sheriff Spanos in gathering the reports. (See, Exhibit L)

4.      Sgt. Bonner wrote Bateman up on September 7, 2002 for "obscene and abusive language toward a co-worker. Bateman was required to complete an anger management course and again placed on six months probation. Sgt. Bonner stated that Bateman would be fired immediately for similar conduct in the future.

"Pouty (insubordinate) and moody" (suicidal) indeed. It may be agreed that Bateman was a go getter (physically aggressive), and he did make a lot of arrests and write a lot of tickets. Even Heber City Officer Dan Bunnell, who recommended that Heber City hire Bateman, testified that he would **not** have recommended Bateman had he known his history at Wasatch County set forth herein. (Bunnell Exh. E, at p. 23-24). Thus, even though Bateman transferred without any break from Wasatch County to Heber City, Heber City essentially admits that it did nothing to check or verify Bateman's record as a police officer, his ability to handle the duties and responsibilities as a police officer or his fitness for duty.

The Defendants hired Ken Wallentine as an expert in this case regarding the allegation of excessive force. Mr. Wallentine is the Chief of Law Enforcement for the Utah Attorney General. Despite extensive experience (with the exception of one police dog bite case) Mr. Wallentine has never opined that an officer used excessive force. (Wallentine Exh. I, at p. 33-34) Not surprisingly, Mr. Wallentine was **not** provided with Bateman's file from Wasatch County, nor

-30-

was he asked to opine on the negligent hiring/supervision issue. The Plaintiffs questioned him

about that anyway.

Q:     In all of the various law enforcement positions and jobs that you've held, have you ever been in a position to - - as yourself or part of a team, evaluate potential hires?

A:     Oh yes. Frequently.

Q:     All right. Let's say that you had an officer apply to "x" police department and you knew that this officer was just coming off a job from "y" department, same county . . . would you check out that officer's history and experience with the other police department?

A:     Yes.

Q:     Can you get their employment record if you want to?

A:     I should be able to. I would hope that I have good relations and that people would be cooperative.

Q:     You can just ask for it, right?

A:     I would ask. I would hope that I would get a cooperative response.

Q:     Well, as a general matter . . . if you're on the committee that's hiring this applicant, you know he's coming from a sister agency that's very close, you would take affirmative steps, wouldn't you . . . to get that information?

A:     I would.          (Wallentine Exh. I, at p. 114-115)

Mr. Wallentine was then provided with the November 6, 1999 report from Sgt. Wayne

Winterton about Bateman. (Exhibit K) Wallentine testified:

A:     . . . If there were red flags in the file, I would run those red flags down, and I would say that there's some red flags in there.

Q:     Pretty bright red flags, don't you think?

A:     You know, I don't - - perhaps, yeah. I mean, there's some questions that - - there's some hard questions that are raised.

Q:     (quoting from Winterton report) "I feel that Deputy Bateman is a great liability to

-31-

the department and the other deputies in the department. It is my recommendation as Deputy Bateman's sergeant that he be immediately relieved of his duties."

Didn't Deputy Bateman predict exactly what he did in this video? Didn't he say exactly what he did in this video is the way he approaches law enforcement and was told at the time that's not the way you do it?

A:    I don't know. I don't know. I'm not - - I don't know what all of the circumstances surrounding that are. I don't know whether this is department politics. I don't know whether there's some feeling - - there's unknowns there, *but I certainly will agree with you that there are concerns there that I would want to address if I were looking at hiring this young man.* (emphasis added)

. . .

Q:    . . . You would agree, wouldn't you, that Heber City should have had this information when they hired [Bateman] . . .?

A:    I would want to have it if I were looking at him.

. . .

Q:    And if you did, would you do anything about it before actually hiring the guy?

A:    I would.

Q:    Do a thorough evaluation, psychological evaluation?

A:    You know, there's - - there's a lot of debate over the merits of doing that. I don't know that I would do that or not, but I certainly would have some hard questions.    (*Id.* at 120-122)

Q:    All right. But you agree with me that [Heber City] should have been aware?

A:    If that guy were applying for a job with me, I would want to have that information on my desk in front of me.    (*Id.* at 125)

It is apparent that Heber City hired Bateman with its collective eyes wide shut, and so

Heber City got its "golden ace" who would continue with his "pouty, moody, "go getter" ways

until he inflicted a severe and permanent brain injury upon David Becker a mere seven months

after being hired.

During his first seven months at Heber City, though Bateman continued to be a prolific ticket writer and arrestor of Heber citizens, there are clear signs that the "problems" he exhibited throughout his tenure at Wasatch County, continued with Heber City.

1.    David Becker himself was arrested by Bateman for DUI in December, 2004. Becker was concerned that his little dog would run out in the street of get lost or run over, and wanted to close his car door before being arrested. Bateman took that as resisting arrest, and he and another officer used force to arrest him.

2.    That same winter, Sarah Larson and her husband Jaxon Allred got into an argument. She called the Heber City Police, merely requesting that the police come and ask Allred to leave. Bateman showed up, got physical with Allred, tried to arrest him, and then tried to make up excuses to justify his abuse. It as necessary for Larson to run outside to get another officer to make Bateman stop abusing Allred. (Larsen Q, at p. 28-33)

> A:    And Jason went to put on his shoes and I was in the other room and I just remember hearing scrabbling noises and I walked back in and I was crying and I was telling Jason [Bateman], I'm like, "Jason, stop it. I didn't ask you to arrest him. I just wanted him to leave." And Jason was all like yanking up his arm behind his back and pressing him up against the counter, trying to like fall over because Jason was just trying to get his boots on and that's when Jason grabbed his arm and twisted it behind his back and was like pushing him and like jarring him around, and that's when I was like: "Jason, stop it. I was crying and I'm like: "Don't do this. I didn't ask you to do that." Jason was all saying back to me: "Sarah, I have to." And I'm like: "No."
>
> I just remember arguing with Jason and then I ran out the door and went and got the other officer and that officer came in and told Jason to stop and it stopped, and he walked Jason outside and let Jason go in the vehicle and leave because that's the only reason why they were there.    (*Id.* at 30-31)

Heber's "golden ace" was really a problem or tragedy waiting to happen.

> Q:    Tell me if this has ever happened to you in your long history. You've got a guy in a department who is a bad apple, pure and simple, bad apple. Nobody likes him. He doesn't like anybody else. You don't want to fire him because you don't want the guy to

sue you. He wants to go someplace else. Great, let's get rid of him. Have you ever seen anything like that?

A:     I'm dismayed to admit that I have.     (Wallentine Exh. I, at p. 125)

## B.     Insufficient Investigation of Bateman-Becker Incident.   Intentional Withholding or Destruction of Evidence.

Immediately after Bateman severely injured Becker, Heber City put a team together to investigate the incident. The team included Sgt. Mike Clegg, Sgt. Perry Rose, Sgt. Jason Bradley and City Attorney Mark Smedley. The team submitted an *Initial After Action Report* two days later on May 16, 2005. (Exhibit F) The report is an entirely self-serving document intended to justify Bateman's actions, and raise the specter that Becker had injured himself prior to Bateman's take down. However, it is clear that there was no real investigation, and the only new information gathered by the team was contrary to its foregone conclusion and therefore not included or destroyed.

The report describes the "investigation."

Witness Statements Collected and or Talked to:

Mark Anderson arrived as suspect was lying on ground and EMTs were working on him. Did not see officer Bunnell. (No useful information)

Unknown citizen talked to Deputy Wayne Winterton. Citizen did not want to fill out a statement.     (Winterton taped the conversation. The tape is not in the investigation file.)

Jason Crumpton; see attached copy of written statement. (Crumpton thought Bateman did not use excessive force.)

Josh Neilson; see attached copy of written statement. (Nielson thought Bateman **did** use excessive force.)

Collected witness statements.     (This refers to Crumpton and Nielson only.   More significantly *no attempt* was made to identify or collect statements from numerous other witnesses who were present and saw and heard what had happened.)

<u>Actions Taken</u>

Notified Chief Ed Rhodes at the time of the incident.

Took Officer Bateman's Dash-cam tape from patrol car.

At 1657 hrs. went to hospital to check on suspect and Officer Bateman.

1740 hrs. went to 340 South 100 West to tell Mr. Becker's wife of incident. Could not make contact, she was not home.

Started initial action report – reviewed use of force policy.

Met with Chief Rhodes, Sgt. Perry Rose

Internal Investigation Board assigned, Sgt. Mike Clegg, Sgt. Perry Rose, Sgt. Jason Bradley, and City Attorney Mark Smedley.

Contacted County Attorney Thomas Low about the incident on 5-14-05

Contacted the Trust about the incident on 5-15-05

Took pictures of the crack window on David Becker's windshield.

This is not an investigation. What this represents is a recognition by the Heber powers-that-be, that the incident has the potential for liability so "let's get together and figure out how we're going to play it." In addition to the standard qualified immunity litany that Becker was "uncooperative, unpredictable, resisting arrest and trying to flee," (objective evidence from the video notwithstanding) the initial thrust of the investigation was to paint Becker as a mean, aggressive drunk who had injured himself prior to the Bateman take-down.

Perry Rose was dispatched to take statements from neighbors, which he did on May 15, 2005. What Rose found out in recorded statements from Sarah Larson, Jaxon Allred, Joan Ivie and Todd Ivie, was exactly the opposite of the Heber City game plan, i.e. that Becker was a nice, gentle, friendly, talented, helpful, intelligent man, and that Bateman was an arrogant, "power happy freak."

(Allred Exh. P, at p. 12-13, 30, 46)  These witnesses, some of whom had personally seen David Becker on the morning of the incident, reported there was nothing wrong with him.  That information was deemed "insignificant" by the Investigation Board and was either suppressed or destroyed.

Reasonable minds could certainly view this conduct as an indication that Heber City knew very well that Bateman had "crossed the line" and used excessive force on Becker resulting in serious injuries, but chose instead to gloss over or hide the truth.

## CONCLUSION

Though there is objective evidence of the incident that gave rise to this lawsuit in the form of the dash-cam video of the Becker-Bateman confrontation, it is clear from the parties' respective briefs that there are numerous material issues of fact which preclude defendants' Motion For Summary Judgment based on qualified immunity.  The main disputed issue is whether Bateman's conduct constituted excessive and/or unnecessary force.  At the time of the incident, the law was well established that the use of excessive force against a suspect who was not resisting or attempting to flee was a constitutional violation.  As to defendant Rhodes and Heber City, if Bateman committed a constitutional violation, those defendants are responsible. Moreover, the plaintiff has provided an unrebutted prima facie case of negligent hiring and supervision, and Heber City's investigation and cover-up concerning the incident is good evidence of its "guilty knowledge" with regard to its own liability.

Defendants' Motion for Summary Judgment should be denied.

DATED this __13th___ day of July, 2009.

                                        EISENBERG & GILCHRIST

-36-

s/Steve Russell
Steve Russell
Attorneys for Plaintiffs

## CERTIFICATE OF MAILING

I hereby certify that on the _13th_ day of July, 2009, a true and correct copy of **MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** was served through the Federal Court filing system to the following:

Peter Stirba
Bret Rawson
STIRBA & ASSOCIATES
215 South State Street
Suite 750
Salt Lake City, UT 84111

s/ Steve Russell